NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

CARPENTERS DISTRICT COUNCIL OF NEW ORLEANS AND VICINITY, AFL–CIO, Respondent.

No. 25408.

United States Court of Appeals Fifth Circuit.

Feb. 19, 1969.

than an admission the same contitutional principle is applied to admissions.

Marcel Mallet-Prevost, Asst. Gen. Counsel, NLRB, Washington, D. C. Richard S. Rodin, Atty., NLRB, Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Solomon I. Hirsh, Atty., N. L. R. B., for petitioner.

Victor H. Hess, Jr., New Orleans, La., for respondent.

Before BROWN, Chief Judge, THORNBERRY, Circuit Judge, and TAYLOR, District Judge.

THORNBERRY, Circuit Judge:

The Board petitions for enforcement of an order requiring respondent, a carpenters' union, to cease and desist from secondary coercion proscribed by section 8(b) (4) (i) and (ii) (B) of the Act (29 U.S.C. § 151 et seq.). The primary employer in the labor dispute was Delta Painting Company, a subcontractor at the construction site of the International Trade Mart Building in New Orleans. Southern Builders, Inc., the general contractor, was the neutral employer at which the illegal secondary pressure allegedly was aimed. The dispute arose when Delta found it necessary to lay off six carpenters and the union, in response to this action, pulled the remaining Delta carpenters off the job temporarily. Delta in turn refused to let the carpenters go back to work, cancelled its contract with the carpenters' union, and gave the work to a lath-

ers' union. The Board found that in order to get the carpenters back to work for Delta the union induced carpenters employed by Southern, the general contractor, to go on strike and pressured Southern's officers to make Delta fire the lathers and rehire carpenters. The union denies responsibility for the strike by Southern's carpenters, but we believe the evidence was more than adequate to support the Board's finding.

■ Thus, this case presents a classic example of secondary coercion: The union brought a neutral employer into its conflict with a primary employer by inducing employees of the neutral to strike and by appealing directly to the neutral's officers. One of the union's defenses is that secondary pressure is not prohibited by the statute unless an object thereof is to force the neutral to cease doing business with the primary employer. The union argues that it never suggested to Southern that it should cease doing business with Delta and had no desire for this to happen; it simply wanted Southern to influence Delta to rehire carpenters. Concededly, the subcontracting agreement between Southern and Delta did not require Delta to use carpenters, but respondent nevertheless argues that it was merely pressuring Southern to use its influence with Delta and that it would not have benefitted in the least from a severance of relations between the two companies. While the statute [8(b) (4) (B)] by its literal terms does require that an object of illegal secondary pressure be to force a neutral to cease doing business with a primary employer, the Board has said, and we agree, that the objective of causing a serious disruption of an existing business relationship, even though something less than a total cancellation of the business connection, is within the intendment of the statute. Electrical Workers Union, Local 3, 1963, 140 N.L.R.B. 729, 52 L.R.R.M. 1118, enf'd, N.L.R.B. v. Local 3, Intern. Broth. Elec. Workers, 2d Cir. 1963, 325 F.2d 561; Longshoremen's Union, Local 1066, 1962, 137 N.L.R.B. 45, 50 L.R.R.M. 1056; In-

ternational Typographical Union, 1962, 136 N.L.R.B. 196, 49 L.R.R.M. 1736, enf'd, New York Mailers' Union No. 6 etc. v. N.L.R.B., 1963, 114 U.S.App.D.C. 370, 316 F.2d 371. In this case, the union's objective was to force Southern to add a condition to its existing subcontracting agreement with Delta, namely, that Delta use only carpenters. Stated another way, the union's objective was to force Southern to cease doing business with Delta under the existing contractual arrangement, which did not require Delta to use carpenters on the job. Secondary coercion to force a neutral to add a condition of this kind to its existing contractual arrangement with the primary employer is an illegal objective within the meaning of the statute. The necessary elements for a violation of 8 (b) (4) (i) and (ii) (B) were established.

■ The union's remaining contention is that it was justified in bringing Southern into its dispute with Delta because Delta would have been contractually obligated to keep carpenters on the job if Southern had lived up to its agreement with the union. Supposedly, Southern's agreement with the union required Southern to include in any subcontracting agreement a clause requiring the subcontractor to abide by the decision of a national board in jurisdictional disputes between unions. Since the national board had awarded the work in question to carpenters, the union argues that Delta would have been obligated to keep carpenters on the job if Southern had included this clause in the subcontracting agreement with Delta. In short, the union says that Southern's breach of its collective bargaining agreement with the union is a defense to the charge of illegal secondary coercion. It is well settled, however, that a violation of the secondary boycott provisions cannot be justified by a contractual arrangement between the union and the neutral employer. Local 1976, United Broth. of Carpenters etc. v. NLRB (Sand Door), 1958, 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186; NLRB v. Interna-

tional Union of Operating Engineers, 9th Cir. 1961, 293 F.2d 319, 322; NLRB v. Bangor Building Trades Council, 1st Cir. 1960, 278 F.2d 287. As a matter of law, the defense asserted by respondent is not a defense.

Enforced.