NATIONAL LABOR RELATIONS BOARD *v.* LOCAL
825, INTERNATIONAL UNION OF OPERATING
ENGINEERS, AFL–CIO

No. 40.   Argued November 18, 1970—Decided January 12, 1971*

*Together with No. 42, *Burns & Roe, Inc., et al.* v. *Local 825,
International Union of Operating Engineers, AFL–CIO, et al.*

298

Marshall, J., delivered the opinion of the Court, in which Burger, C. J., and Black, Harlan, Brennan, White, and Blackmun, JJ., joined. Douglas, J., filed a dissenting opinion, in which Stewart, J., joined, post, p. 306.

Arnold Ordman argued the cause for the National Labor Relations Board, petitioner in No. 40 and respondent in No. 42. With him on the brief were Solicitor General Griswold, Peter L. Strauss, Dominick L. Manoli, and Norton J. Come. Vincent J. Apruzzese argued the cause for petitioners in No. 42. With him on the brief were Francis A. Mastro and Merritt T. Viscardi.

Earl S. Aronson argued the cause for respondent Local 825, International Union of Operating Engineers, in both cases. With him on the brief was Thomas E. Durkin, Jr.

Laurence Gold argued the cause for the American Federation of Labor and Congress of Industrial Organizations as amicus curiae urging affirmance in both cases. With him on the brief were J. Albert Woll and Thomas E. Harris.

Briefs of amici curiae urging reversal in both cases were filed by William B. Barton and Harry J. Lambeth for Associated Builders & Contractors, Inc., and by Winthrop A. Johns and Lawrence T. Zimmerman for the Associated General Contractors of America et al.

MR. JUSTICE MARSHALL delivered the opinion of the Court.

In this cause we are asked to determine whether strikes by Operating Engineers at the site of the construction of a nuclear power generator plant at Oyster Creek, New Jersey, violated § 8 (b)(4)(B) [1] of the National Labor Relations Act. Although the National Labor Relations Board found the strikes to be in violation of this section, the Court of Appeals refused to enforce the Board's order.[2] We believe the Court of Appeals construed the Act too narrowly. Accordingly, we reverse and remand the case for consideration of the propriety of the Board's order.

---

[1] Sec. 8 (b) "It shall be an unfair labor practice for a labor organization or its agents—

"(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise, handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 9: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing . . . ." 61 Stat. 141, as amended, 73 Stat. 542, 29 U. S. C. § 158 (b)(4)(B).

[2] 410 F. 2d 5.

The general contractor for the project, Burns & Roe, Inc., subcontracted all of the construction work to three companies—White Construction Co., Chicago Bridge & Iron Co., and Poirier & McLane Corp. All three employed operating engineers who were members of Local 825, International Union of Operating Engineers. But White, unlike Chicago Bridge and Poirier, did not have a collective-bargaining agreement with Local 825.

In the latter part of September 1965, White installed an electric welding machine and assigned the job of pushing the buttons that operated the machine to members of the Ironworkers Union, who were to perform the actual welding. Upon learning of this work assignment, Local 825's job steward and its lead engineer threatened White with a strike if operating engineers were not given the work. White, however, refused to meet the demand. On September 29, 1965, the job steward and lead engineer met with the construction manager for Burns, the general contractor. They informed him that the members of Local 825 working at the jobsite had voted to strike unless Burns signed a contract, which would be binding[3] on all three subcontractors as well as Burns, giving Local 825 jurisdiction over all power equipment, including electric welding machines, operated on the jobsite. On October 1, after White and Burns refused to

---

[3] The proposed contract provided in part:

"This Agreement shall bind all sub-contractors while working for an Employer who is a party to this Agreement. Any Employer who sublets any of his work must sublet the same subject to all the terms and conditions of this Agreement.

"The Employer agrees that he will not subcontract any of his work, which is covered by the terms of this Collective Bargaining Agreement, to any subcontractor, unless said subcontractor agrees in writing to perform said work subject to all terms and conditions of this Agreement between the Employer and the Union, including an agreement to submit work jurisdictional disputes for determination as provided below."

accede to the demands, the operating engineers employed by Chicago Bridge and Poirier as well as those employed by White walked off the job. They stayed out from 8 a. m. to 1 p. m., returning to work when negotiations over their demands started.

On October 6, Burns submitted the work assignment dispute to the National Joint Board for the Settlement of Jurisdictional Disputes for the Construction Industry.[4] The same day, Local 825 threatened Burns and all the subcontractors with another work stoppage unless the contracts were signed and the work transferred to the operating engineers. The employers again refused, and the operating engineers walked off the project. This strike lasted from October 7 to October 11.

On October 20, the Joint Board notified the parties that there was no reason to change the assignment of the disputed work. Local 825 did not accept this resolution; and when the welding machine was started on November 4, the operating engineers surrounded the machine and physically prevented its operation. On November 8, the NLRB Regional Director obtained from the United States District Court a temporary injunction under § 10 (l)[5] of the Act restraining the union from coercing a cessation of business on the project or to compel White to change the work assignment.[6]

---

[4] A private organization that arbitrates jurisdictional disputes in the construction industry.

[5] 29 U. S. C. § 160 (l).

[6] The Operating Engineer's activity did not stop with the issuance of the injunction. White's engineers struck again on November 17, this time ostensibly over a dispute concerning the number of employees assigned to operate a recently installed electrical pump. Local 825 representatives in a discussion with White said, however, that this walkout "was more or less because of the electric welding machine being in operation." The strike lasted until December 21. Of course the activity like that on November 4 did not involve § 8 (b) (4) (B) violations since only the engineers working for White were involved.

302

An unfair labor practice proceeding against Local 825 subsequently ensued. The Board found that the union had violated § 8 (b)(4)(D)[7] of the Act by inducing employees of White, Chicago Bridge, and Poirier to strike to force White to take the disputed work away from the Ironworkers and assign it to the Operating Engineers. The Court of Appeals' approval of this finding is not questioned here. But the Board's finding that Local 825's encouragement of the Chicago Bridge and Poirier employees to strike and the union's coercion of Burns violated § 8 (b)(4)(B) of the Act was not approved by the Court of Appeals and is in issue here.

I

Congressional concern over the involvement of third parties in labor disputes not their own prompted § 8 (b)(4)(B). This concern was focused on the "secondary boycott,"[8] which was conceived of as pressure brought to

---

[7] Sec. 8 (b) "It shall be an unfair labor practice for a labor organization or its agents—

.     .     . .     .

"(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise, handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry . affecting commerce, where in either case an object thereof is—

.     .     .     .     .

"(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work . . . ." 29 U. S. C. § 158 (b)(4)(D).

[8] See Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 394 U. S. 369, 386–390 (1969); National Woodwork Mfrs. Assn. v. NLRB, 386 U. S. 612, 624 (1967).

bear, not "upon the employer who alone is a party [to a dispute], but upon some third party who has no concern in it" [9] with the objective of forcing the third party to bring pressure on the employer to agree to the union's demands.[10]

Section 8 (b)(4)(B) is, however, the product of legislative compromise and also reflects a concern with protecting labor organizations' right to exert legitimate pressure aimed at the employer with whom there is a primary dispute.[11] This primary activity is protected even though it may seriously affect neutral third parties. *Steelworkers* (Carrier Corp.) v. *NLRB*, 376 U. S. 492, 502 (1964); *Electrical Workers* (General Electric) v. *NLRB*, 366 U. S. 667, 673 (1961).

Thus there are two threads to § 8 (b)(4)(B) that require disputed conduct to be classified as either "primary" or "secondary." And the tapestry that has been woven in classifying such conduct is among the labor law's most intricate. See *Brotherhood of Railroad Trainmen* v. *Jacksonville Terminal Co.*, 394 U. S. 369 (1969). But here the normally difficult task of classifying union conduct is easy. As the Court of Appeals said, the "record amply justifies the conclusion that [Burns and the neutral subcontractors] were subjected to coercion in the

---

[9] *Electrical Workers, Local 501* v. *NLRB*, 181 F. 2d 34, 37 (CA2 1950), aff'd, 341 U. S. 694 (1951).

[10] The House Conference Report explained this idea:

"Thus it was made an unfair labor practice for a union to engage in a strike against employer A for the purpose of forcing that employer to cease doing business with employer B. Similarly it would not be lawful for a union to boycott employer A because employer A uses or otherwise deals in the goods of, or does business with, employer B." H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 43 (1947).

[11] The section contains a specific proviso, which was added by the 1959 amendment to the Act, that protects a "primary strike or primary picketing" that is "not otherwise unlawful." See n. 1, *supra.*

form of threats or walkouts, or both." 410 F. 2d, at 9. And, as the Board said, it is clear that this coercion was designed "to achieve the assignment of [the] disputed work" to operating engineers. 162 N. L. R. B. 1617, 1621.

Local 825's coercive activity was aimed directly at Burns and the subcontractors that were not involved in the dispute. The union engaged in a strike against these neutral employers for the specific, overt purpose of forcing them to put pressure on White to assign the job of operating the welding machine to operating engineers. Local 825 was not attempting to apply the full force of primary action by directing its efforts at all phases of Burns' normal operation as was the case in *Steelworkers* (Carrier) v. *NLRB,* 376 U. S. 492 (1964), and *Electrical Workers* (General Electric) v. *NLRB,* 366 U. S. 667 (1961). It was instead using a sort of pressure that was unmistakably and flagrantly secondary. *NLRB* v. *Denver Building & Construction Trades Council,* 341 U. S. 675 (1951).

The more difficult task is to determine whether one of Local 825's objectives was to force Burns and the other neutrals to "cease doing business" with White as § 8 (b)(4)(B) requires. The Court of Appeals concluded that the union's objective was to force Burns "to use its influence with the subcontractor to change the subcontractor's conduct, not to terminate their relationship" and that this was not enough. 410 F. 2d, at 10. That court read the statute as requiring that the union demand nothing short of a complete termination of the business relationship between the neutral and the primary employer. Such a reading is too narrow.

Some disruption of business relationships is the necessary consequence of the purest form of primary activity. These foreseeable disruptions are, however, clearly protected. *Steelworkers* (Carrier), 376 U. S., at 496; *Electrical Workers* (General Electric), 366 U. S., at 682.

Likewise, secondary activity could have such a limited goal and the foreseeable result of the conduct could be, while disruptive, so slight that the "cease doing business" requirement is not met.

Local 825's goal was not so limited nor were the foreseeable consequences of its secondary pressure slight. The operating engineers sought to force Burns to bind all the subcontractors on the project to a particular form of job assignments. The clear implication of the demands was that Burns would be required either to force a change in White's policy or to terminate White's contract. The strikes shut down the whole project. If Burns was unable to obtain White's consent, Local 825 was apparently willing to continue disruptive conduct that would bring all the employers to their knees.

Certainly, the union would have preferred to have the employers capitulate to its demands; it wanted to take the job of operating the welding machines away from the Ironworkers. It was willing, however, to try to obtain this capitulation by forcing neutrals to compel White to meet union demands. To hold that this flagrant secondary conduct with these most serious disruptive effects was not prohibited by § 8 (b)(4)(B) would be largely to ignore the original congressional concern. *NLRB* v. *Carpenters Dist. Council*, 407 F. 2d 804, 806 (CA5 1969).

## II

In addition to its argument that § 8 (b)(4)(B) does not cover its conduct, Local 825 argues that § 8 (b)(4)(D) provides the exclusive remedy. Clearly, § 8 (b)(4)(D) is, as the Board and Court of Appeals held, applicable. But that section is aimed at protecting "the employer trapped between the . . . claims" of rival unions. *National Woodwork Mfrs. Assn.* v. *NLRB,* 386 U. S. 612, 625 (1967). Although § 8 (b)(4)(D) also

applies to neutrals, the basic purpose is different from that of §8 (b)(4)(B). The practices here were unfair under both sections and there is no indication that Congress intended either section to have exclusive application.

## III

Since the Court of Appeals did not believe that §8 (b)(4)(B) was applicable, it did not consider the propriety of the portion of the Board's order relating to that section. But the order was not narrowly confined to the conduct involved here; so we must remand these cases for the Court of Appeals to consider whether the order is necessary to further the goals of the Act. See *Communications Workers* v. *NLRB,* 362 U. S. 479 (1960); *NLRB* v. *Express Publishing Co.,* 312 U. S. 426 (1941).

*Reversed and remanded.*

Mr. Justice Douglas, with whom Mr. Justice Stewart concurs, dissenting.

If we take the words of the Act, rather than what the courts have interpolated, and lay them alongside the facts of this cause, I do not see how we can fairly say that Local 825 engaged in an "unfair labor practice" within the meaning of §8 (b)(4)(B). Local 825 did use coercion to get jobs from White for its workers. The Board termed it "causing a disruption of the business relationship among the various employers at the jobsite," which it held was within the ban of §8 (b)(4)(B) since Local 825's aim, though not "a total cancellation of a business relationship" with White, constituted a "cease doing business" purpose. The Board said: "an object of the Respondent was to force Burns to cease doing business with White, and to force Chicago Bridge and Poirier to cease doing business with Burns in order to compel

Burns to cease doing business with White." 162 N. L. R. B. 1617, 1621–1622.

Yet as the Trial Examiner found: "Respondent never indicated it wanted White off the job—it wanted to harass White to gain compliance with its requests. Nor was any demand made upon Burns to cease doing business with White. . . . All Respondent wanted was the work, not a substitution of contractors nor a termination of contractual relationships between the contractors."

Our question turns not on the findings of fact but on the question of law which emerges, whether what was done had as its purpose to induce the general contractor and subcontractor to "cease doing business" with White.

We held in *NLRB* v. *Denver Building & Construction Trades Council*, 341 U. S. 675, 688, that an effort "to force" a subcontractor in the position of White "off the job" satisfied the "cease doing business" test though that purpose was not the exclusive one. A strike to achieve that end, we held in *Electrical Workers* v. *NLRB*, 341 U. S. 694, 700, also brought the coercive means within the same ban. And in *Steelworkers* v. *NLRB*, 376 U. S. 492, 496, we held that a union on strike against an employer, Carrier, had not violated the "cease doing business" ban, when it picketed at an entrance used exclusively by railroad personnel "to induce the railroad to cease providing freight service to Carrier for the duration of the strike."

The case here is plainly different. The aim was not to freeze out White or to close it down for an hour or for the duration. It was merely to get the work, whose assignment it controlled, for members of Local 825. The case is therefore the classic jurisdictional conflict covered by § 8 (b)(4)(D) which makes "forcing or requiring any employer to assign particular work to employees

in a particular labor organization" an unfair labor practice.

The Board properly issued a cease-and-desist order concerning the jurisdictional dispute condemned by § 8 (b)(4)(D). The fact that (D) may be involved does not necessarily mean that (B) may not also be involved, as the two are not "mutually exclusive." *Local 5, Plumbing & Pipe Fitting Industry,* 137 N. L. R. B. 828, 832.* But where the facts show only the jurisdictional dispute condemned by § 8 (b)(4)(D) and no plan to close down White either permanently or for a day or even an hour, we should not only hold that § 8 (b)(4)(B) is not satisfied; we should also hold that (D) cannot do service for (B) where there is no element of "ceasing" to do business present.

---

*And see *Local 5, Plumbing & Pipe Fitting Industry,* 145 N. L. R. B. 1580; *Millwrights Local 1102,* 162 N. L. R. B. 217.