**GEORGE KOCH SONS, INC.,**
**Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**LOCAL UNION NO. 438, UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF the PLUMBING AND PIPEFITTING INDUSTRY OF the UNITED STATES AND CANADA, AFL-CIO, et al., Petitioners,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Nos. 73-1019, 73-1480.**

United States Court of Appeals, Fourth Circuit.

Argued Oct. 3, 1973.

Decided Dec. 14, 1973.

Winthrop A. Johns, Washington, D.C. and Joseph A. Yocum, Evansville, Ind. (Johns & Zimmerman, Washington, D.C. and Kahn, Dees, Donovan & Kahn, Evansville, Ind., on brief), for petitioner in No. 73–1019.

Gerard C. Smetana, Chicago, Ill. (Milton A. Smith, Gen. Counsel, Otto F. Wenzler and Richard B. Berman, Labor Relations Counsel, Washington, D.C., S. Richard Pincus, Lederer, Fox & Grove, Chicago, Ill., on brief), for amicus curiae, The Chamber of Commerce of the United States in No. 73–1019.

Vincent J. Apruzzese, Springfield, N. J. (Francis A. Mastro, Apruzzese & McDermott, Springfield, N.J., on brief), for amici curiae, Public Service Electric and Gas Co., etc., in Nos. 73–1019 and 73–1480.

Cosimo C. Abato, Baltimore, Md. (Anthony A. Abato, Jr., Bracken & Abato, P. A., and Paul E. Gaeng, Baltimore, Md., on brief), for petitioners in No. 73–1480.

Roger C. Hartley, Washington, D.C. (Patrick C. O'Donoghue and Donald J. Capuano, Washington, D.C., on brief), for amicus curiae, United Assn.

Kenneth C. McGuiness and Robert E. Williams, Washington, D.C., on brief for amici curiae, Air-Conditioning and Refrigeration Institute, and others.

Jay E. Shanklin, Atty., N.L.R.B. (Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Asst. Gen. Counsel, Washington, D.C., on brief), for respondent in Nos. 73–1019 and 73–1480.

Before BRYAN, Senior Circuit Judge, and CRAVEN and WIDENER, Circuit Judges.

ALBERT V. BRYAN, Senior Circuit Judge:

A secondary boycott in violation of the National Labor Relations Act, Section 8(b)(4)(i)(ii)(B), 29 U.S.C. §

158(b)(4)(i)(ii)(B), as amended,[1] was pursued by each of two labor unions, the National Labor Relations Board has found.[2] On the charges of a general contractor,[3] complaints were issued and jointly heard. In both cases the contractor, while accepting the Board's decision, nevertheless sought review in an endeavor to broaden the fact findings and legal conclusions; the unions asked vacation of the Board's remedial order. Countering, the Board prays enforcement of its order. We enforce the order.[4]

With a hearing before the Trial Examiner waived, the controversy was put before him on briefs and facts agreed. The Board adopted the "findings, conclusions and recommendations of the Administrative Law Judge [the Examiner]", summed up as follows:

"The relevant stipulated facts as noted by the Administrative Law Judge show that on June 17, 1970 George Koch Sons, Inc., hereinafter Koch, was awarded a contract by General Electric Company, hereinafter G.E., for the design, manufacture, and installation of two industrial finishing systems to be used in the preparation of metal appliances at G.E.'s plant in East Columbia, Maryland. Pursuant to a contract interpretation calling for the pretesting of certain pipes for this system, Koch prefabricated certain pipes at its Indiana facility using its own employees to do this fabrication work. Thereafter, this pipe was utilized to pretest the systems.

"Koch subcontracted to Phillips Plumbing and Heating Co., hereinafter Phillips, the work of installing all pipe required in the final assembly of the systems at the G.E. site. Pursuant to its contract with Koch and the specifications made a part thereof, Phillips was required to install, *inter alia*, the prefabricated pipe.

"Both Respondents [the unions] had a current agreement with the Mechanical Contractors Association of Maryland, hereinafter the Association. Although not a member of the Association, Phillips was a signatory to the current agreements and, pursuant to their provisions, employed members of Respondent Local 48 for plumbing work and members of Respondent Local 438 for steamfitting-pipefitting work. Both of these agreements contained the following clause:

> 'All pipe of any size used on the job shall be cut and threaded by journeymen and apprentices either by machine or by hand and all fitting to be made up (of any size), caulked, or otherwise, fitted to any pipe, must be done on the job or in the contractor's shop by journeymen and apprentices.'

1. Section 8(b)(4) of the Act, as amended by the Labor-Management Reporting and Disclosure Act of 1959, provides, in apt part, that it shall be an unfair labor practice for a union or its agents:

   (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, article, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

   (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person . . .

2. 201 NLRB No. 7 (January 5, 1973).

3. The unions were Locals No. 438 and 48, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL–CIO. They will be referred to as the "unions". The charging party was George Koch Sons, Inc., an Indiana corporation, a contractor for General Electric Company and now called "Koch". No jurisdictional question is involved.

4. In Sachs v. Local Union No. 48, United Ass'n of Journeymen and Apprentices, 454 F.2d 879 (4 Cir. 1972), we sustained the Board's application for an injunction under § 10(*l*) of the Act restraining the unions from engaging in the strike until the Board had ruled upon the present complaints.

As a result of these provisions, which have been included in the Respondents' collective-bargaining agreements for years, the cutting, threading, and fitting of pipes have customarily been performed on the jobsite or in shops within the Baltimore vicinity by individuals who are employed by the employers signatory to the agreements and who are members of or are represented by the Respondents.

"Beginning about March 15, 1971, Koch shipped both the prefabricated pipe (that used in the pretesting) and certain nonprefabricated pipe to the G.E. jobsite. The employees of Phillips represented by the Respondents worked on and installed the nonprefabricated pipe without incident. But, when Phillips attempted to assign the work of installing the prefabricated pipe to the employees represented by the Respondents, Phillips was told by officers and agents of both Respondents that the Respondents would not let their members or employees represented by them install that prefabricated pipe because it had not been cut, threaded, and fitted on the jobsite or in Phillips' shop in accordance with the above-quoted provisions of their agreements with the Association. Thereafter, since on or about May 1, 1971, Phillips' employees who were members of or represented by the Respondents, pursuant to instructions from Respondents' officials, refused to install the prefabricated pipe although requested to do so by Phillips, while they continued to install the nonprefabricated pipe.

"The Administrative Law Judge concluded that 'by the actions of their officers and agents in stating to Phillips that they would not allow employees of Phillips who were members of or represented by Respondents to install the prefabricated pipe on the G.E. job because the pipes were not cut, threaded, and fitted with the facilities on the jobsite or in Phillips' shop by employees represented by Respondents, or by so instructing employees of Phillips, both Respondents violated Section 8(b)(4)(i)(ii)(B)' of the Act.

"We agree with this conclusion of the Administrative Law Judge. However, in view of the importance of the issue presented, we deem it necessary to explicate in detail our reasons for doing so." [Footnotes omitted.]

Thereupon the unions were directed to "cease and desist" from encouraging employees to refuse to perform services where the object was to force Phillips to refrain from installing prefabricated pipe. For us this conduct examples the classic secondary boycott. NLRB v. Operating Engineers, 400 U.S. 297, 302, 303, 91 S.Ct. 402, 27 L.Ed.2d 398 (1971). It is fair to state now that we see the Board's decision, adjudging the unions guilty of a secondary boycott, firmly bottomed on substantial evidence.

The unions bear down on the Board's opinion as but an all-out exploitation of the "right-to-control" doctrine. Untangled, the doctrine is that if an employer is not legally empowered to meet his employees' demand, then they cannot lawfully strike him for his failure to accede. Applied now, the clauses of the Phillips-union agreements—that the pipe must be cut and threaded on the jobsite or at Phillips' shop—could not be pressed against Phillips if it was not vested with the right to fix where pipe fabrication would be done.

The unions dismiss "right-to-control" as obsolete dogma, discredited, if not fully eclipsed, by National Woodwork Manufacturers Ass'n v. National Labor Relations Board, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). Further, it is argued that this gauge, if at all still viable, is now misconceived by the Board as the end-all, critical determinant that a boycott is secondary rather than primary. Additionally, the unions expound those in suit to be work preservation clauses, purposed solely to retain for the Phillips' employees tasks customarily performed by them and avouched in *National Woodwork* to be a traditional right of labor, in no wise affronting the Act.

In replication, the Board and Koch denounce the clauses as actually projected

by the unions to be "tactically calculated to satisfy union objectives elsewhere." *National Woodwork*, at 644, 87 S.Ct. at 1268. When so activated, the argument runs, the restrictions engender the forbidden secondary boycott. Cf. NLRB v. Denver Building & Construction Trades Council, 341 U.S. 675, 686, 687, 71 S.Ct. 943, 95 L.Ed. 1284 (1951).

The unions err. *National Woodwork* did not scuttle the "right-to-control" test for, obviously, the point was not before the Court. 386 U.S. at 616–617, fn. 3, 87 S.Ct. 1250. Nor does the Board presently write in disregard of *National Woodwork*. Rather, it reads that decision for what it is, a delineation of that degree of proof which establishes a permissible primary boycott but falls short of evidencing the interdicted secondary boycott.

Further, *National Woodwork*, at 644–645, 87 S.Ct. at 1268, after defining a preservation-of-work boycott, signally declares that when "the agreements and boycott were tactically calculated to satisfy union objectives elsewhere" they present a secondary boycott. The further lesson of *National Woodwork* is that the ascertainment of whether the "agreements and boycott" do have this effect can be made only upon inquiry of "all the surrounding circumstances". Notably, right-to-control is not excluded from this consideration. Id. at 644, 87 S.Ct. at 1268. Despite the union's opposing contention, the Board has not exalted right-to-control as per se the conclusive indicium of a secondary boycott. On the contrary, the Board obediently followed the Court's instruction, according weight to all existing and relevant circumstances. This consideration included extraordinary facts well beyond the events of *National Woodwork*.

The incidents not paralleled in *National Woodwork* were these: no right-to-control was possessed by the employer; the unions were informed of the employer's lack of control; the employer-contractor agreement required the fabrication to be done at the latter contrac-

tor's location; and the contract between that contractor and the owner obligated that contractor to fabricate the pipe at its place of business. These circumstances are quite material in differencing the facts here from those of *National Woodwork*. The Court there did not have to ponder these added circumstances to the existence or absence of a secondary boycott. Thus it did not preordain decision here.

■ The decisive question, therefore, is whether in the light of "all the surrounding circumstances" the agreements and boycott between Phillips and the unions were "tactically calculated to satisfy union objectives elsewhere". We think the Board was right in concluding that they were.

To begin with, since the unions were aware of the conditions in the Phillips-Koch pact, they knew that Phillips did not have control of the pipe fabrication. Consequently, their enforcement of the collective bargaining terms evinces the unions' intention to press their objectives "elsewhere" other than upon Phillips.

Moreover, Koch and the unions were not in privity; neither was bounden to the other. Koch, then, was a neutral, and yet with regard to it the unions still sought to prosecute the conditions in order to "satisfy the union objectives" beyond Phillips. This, too, is precisely—and even more emphatically—the posture of the unions with respect to G.E. To repeat, these facts confirm the Board's finding of the tactical effect.

These conclusions are not gainsaid or diminished by the unions' insistence that the stipulations are enforceable as work-preservation measures. The Board did not nullify the clauses as work-preservation assurances; they remained available for appropriate application. However, regardless of their initial intendment, they could by undue extension, over and above the Phillips-employee relationship, lead to violations of § 8(b)(4)(B) of the Act.

■ That the clauses have been so exerted in this instance is, it appears, precisely the illegality the Board perceived in the unions' actions. Like the Board, we see Phillips as not an "offender" but rather a neutral vis-a-vis its employees; therefore the effect of the strike was to compel Phillips unlawfully "to cease doing business with any other person". Granted, the efficacy of work-preservation covenants is not to be stunted because of the severity of their impact. *National Woodwork*, at 627, 87 S.Ct. 1250; see also NLRB v. Operating Engineers, supra, 400 U.S. 297, at 303, 91 S.Ct. 402, 27 L.Ed.2d 398. Nevertheless, if a result of that pressure is to cause a neutral employer (here Phillips) to terminate his business with another (Koch), then such enforcement fouls the Act. That this use or effect of the clauses is inconsistent with the intent of the Act is corroborated in *National Woodwork*, at p. 625, 87 S.Ct. at p. 1258:

> "The other subsections of § 8(b)(4) of the Act were similarly limited to protecting employers in the position of neutrals between contending parties . . . . The central theme pervading these provisions of protection for the neutral employer confirms . . . that . . . Congress likewise meant to protect the employer only from union pressures designed to involve him in disputes not his own."

See also *Denver Building*, supra, 341 U. S. 675, at 689, 71 S.Ct. 943, 95 L.Ed. 1284.

Joining the Board, we are unwilling to construe the Phillips-unions contract so rigidly as to trammel Phillips in its intercourse with customers outside of Maryland, e. g. Koch or G.E. So severe an execution of the collective bargaining agreement would not only invade the rights of Maryland contractors, such as Phillips, but it would hobble their interstate transactions. Not to reprove the boycott of Phillips would be a plain discard of § 8(b)(4)(B). It would be tacit approval of the unions' compulsion of Phillips to "cease doing business" with any person, in-State or out, not a signatory to the instant Maryland collective bargaining agreement.

Conversely, in like circumstances, not only Koch but every other in- or out-of-state contractor would be unable to contract with any Maryland business, which was a party to the collective agreement, without subjection to the agreement's restrictive clauses. Incidentally, the employees of Koch and of like outsiders would at the same time suffer from these limitations.

■ Admittedly, an employer should not have an unfettered license to contract out work and, as a result, acquire a shield from union collective bargaining agreements. Certainly where the employer was initially in a position to accede to potential union demands through the negotiating stages of the contract, then he should not later be deemed a neutral if he intentionally forfeited his potential for control. But the circumstances now presented show that G.E. required Koch to pretest the pipe at the latter's location in Indiana—thus away from the jobsite—and for this purpose the pipe had first to be fabricated. Since Koch was inextricably tied to this schedule, Phillips had no bargaining power with respect to this work. Consequently, Phillips did not surrender its right-to-control, for it never had any.

Of course, Phillips and its immediate contractor could fake the appearance of a secondary boycott by a collusive contract providing that the work ordinarily belonging to Phillips' employees should be performed elsewhere. But there is not even an intimation or trace of connivance or such complicity here. Indeed, the extraordinary circumstances outlined earlier banish any suspicion of it. Phillips had no motive to favor the arrangement with Koch. Indeed, it deprived Phillips of profitable work.

Finally, we dispose of the case under § 8(b)(4)(B) of the Act, and notwithstanding references in the arguments of counsel to § 8(e), we observe nothing in the latter section to warrant modification of the conclusions herein expressed.

Order enforced.