VASSAR CONSTRUCTION,
INC., Plaintiff,

v.

TEAMSTER LOCAL UNION NO. 445, IN-TERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Defendant.

No. 73 Civ. 1778.

United States District Court,
S. D. New York.

July 8, 1977.

Robert E. Ferguson, Poughkeepsie, N. Y., for plaintiff.

Friedlander, Gaines, Cohen, Rosenthal & Rosenberg, New York City, for defendant, by David Kramer, New York City, of counsel.

## OPINION AND ORDER

KEVIN THOMAS DUFFY, District Judge.

This action is brought pursuant to Section 303 of the Labor Management Relations Act, 29 U.S.C. § 187, to recover damages purportedly resulting from an unlawful secondary boycott allegedly engaged in by defendant. This opinion constitutes my findings of fact and conclusions of law after trial. Rule 52(a), F.R.Civ.P.

Plaintiff, a New York corporation located in Poughkeepsie, is a general contractor in the construction industry. On February 9, 1970, plaintiff contracted with Poughkeep-sie's Union Free School District # 2 for the construction of a high school on Spackenkill Road in Poughkeepsie. In connection with the job, which was to commence immediately and be completed by July 15, 1971, plaintiff engaged Woodcliff Construction Corporation as a subcontractor to grade, clear and excavate the site for $141,000. Woodcliff began this work at the Spackenkill job site on March 9, 1970.

Defendant is a labor organization within the meaning of 29 U.S.C. § 152(5). By letter dated March 9, 1970, defendant informed plaintiff that it expected a "pre-job conference" in connection with the Spackenkill job award. No reply to this letter was made by plaintiff upon its receipt on March 12, 1970; however, on that same day, defendant began to picket the Spackenkill job site with signs reading "Vassar Unfair to Members of Local 445, IBTCWHA." The following day, March 13, 1970, Andrew Velletri, plaintiff's president, accompanied by counsel, met with Chet Davis and Tony Alecci, representatives of defendant. Velletri was informed that defendant desired plaintiff to execute its collective bargaining agreement which would contain, *inter alia*, a shop steward clause. He was given a copy of the agreement to consider, but informed the representatives by telephone the following day, if not at the time of the meeting, that plaintiff would not individually sign the agreement since it belonged to an association of general contractors and material suppliers with whom contracts were collectively made.

The picketing at the Spackenkill site continued during this time; on March 13, 1970, plaintiff advised Woodcliff by letter that it had created an additional entrance gate for Woodcliff's use in entering and exiting the job site. Plaintiff had posted a sign at this entrance (the Woodcliff gate) which read "This Gate for Employees & Deliverymen Woodcliff Const. Only;" the original entrance (the Vassar gate) bore a sign which read "This Gate for Employees & Deliverymen Vassar Const. Only." Beginning on March 23, the Woodcliff gate was picketed with signs reading "Woodcliff Constr'n Unfair to Members of Local 445, IBTCWHA."

The pickets previously directed at Vassar were confined to the Vassar gate. Picketing at both gates continued until approximately May 12, 1970, at which time it was halted by the issuance of a temporary injunction successfully sought in this Court by the National Labor Relations Board pursuant to Section 10(*1*) of the National Labor Relations Act, as amended, 29 U.S.C. § 160(*1*).[1]

During the period of the picketing, all work on the Spackenkill job site ceased. Several pieces of equipment, including compressors and a bulldozer, had been left at the site by Woodcliff but no work by either plaintiff or Woodcliff continued. On May 13, 1970, the excavation work recommenced. Plaintiff's contract with the school district contemplated a completion date of July 15, 1971 so that the school could be occupied for classes in September 1971. The September 1971 occupancy date was apparently met; however, the school was not completed apparently until the winter months which followed.

Plaintiff contends that the delay in the commencement of the work caused by the picketing by defendant resulted in the inability to enclose the building prior to December 1971, the onset of winter. Thus, plaintiff maintains that additional and substantial expenditures in terms of temporary heating, increased labor and the like, were incurred, for which it seeks reimbursement in damages. Defendant disputes both liability and damages.

## LIABILITY

Section 8(b)(4)(B) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(B), provides in part that it shall be an unfair labor practice for a union or its agent:

(i) . . . to induce or encourage any individual employed by any person . . . to engage in, a strike . . . or (ii) to threaten, coerce or restrain any person . . . where in either case an object thereof is—

.    .    .    .    .

(B) forcing or requiring any person . . . to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees . . . :

*Provided*, That nothing contained in this clause (B) shall be construed to make lawful, where not otherwise unlawful, any primary strike or primary picketing;

This section, incorporated by reference into the jurisdictional predicate for this action,[2] is aimed at protecting neutral employers with whom a union has no dispute from secondary involvement in controversies between a union and an offending employer, while preserving the union's right to engage in primary activity directed against the latter. *NLRB v. Local 825, Operating Engineers*, 400 U.S. 297, 302–3, 91 S.Ct. 402, 27 L.Ed.2d 398 (1971); *Helgesen v. Int'l Assoc. of Bridge, Structural & Ornamental Ironworkers, Local Union 498*, 548 F.2d 175, 180 (7th Cir. 1977). It is plaintiff's conten-

1. Defendant was enjoined by order of Judge Tenney of May 1, 1970. This injunction was dissolved by order of Judge Ryan on September 28, 1971, following resolution of the case before the National Labor Relations Board. Defendant has represented that this proceeding, enforced by the Second Circuit, was resolved by a settlement agreement containing a nonadmission clause.

2. Section 303 of the National Labor Management Relations Act, 29 U.S.C. § 187, provides:
   (a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organiza-

tion to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title.
   (b) Whoever shall be injured in his business or property by reason of any violation of subsection (a) of this section may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit.

tion that defendant violated this section, thereby triggering this civil action for damages sustained as a result, by picketing the Woodcliff gate, when no dispute existed with Woodcliff, for the sole purpose of inducing plaintiff to recognize and bargain with defendant. The initial inquiry, then, is whether plaintiff has sustained its burden of showing that Woodcliff was, in fact, a neutral employer against whom unlawful secondary activity was directed.

In support of Woodcliff's characterization as a neutral employer, the testimony of Joseph E. Paggi, Woodcliff's President and sole stockholder, was elicited. Mr. Paggi incorporated Woodcliff, and runs the business by himself out of his home. He rents all the equipment he uses from various concerns who also, at times, supply the operating personnel for the various machines. One such concern was V. J. Constanzi, Inc., a construction company for whom Mr. Paggi worked as a general manager until 1969. It was from V. J. Constanzi, Inc, that Woodcliff leased, among other things, two trucks and a loader which were used at the Spackenkill site on March 10 and 11, 1970, as well as the equipment to move various machines to the site.

Defendant argues that it believed that Woodcliff, which allegedly was not paying area standard wages and fringe benefits, was being used by V. J. Constanzi, Inc., with whom defendant had a collective bargaining agreement, as a subterfuge to avoid contractual obligations. The preponderance of the credible proof adduced at trial, however, does not support this belief. Indeed, the record is devoid of any indication that substandard wages were being paid by anyone.

Woodcliff rented both stripped and operated equipment from V. J. Constanzi, Inc. On March 9 through 11, 1970, Woodcliff had a bulldozer, two trucks, a loader, compressors and drills at the Spackenkill site. The bulldozer was rented from a concern other than Constanzi, the compressors, which were stationary, were owned by Woodcliff. The trucks and loader were rented from Constanzi. The rental agreements for this equipment provided that the lessor provide the operators; and Mr. Paggi testified that those operators who refused to cross the picket lines to work on the excavation on March 12, 1970, were all union men with various trades who "were all with the equipment." As union men, they were apparently subject to the area wages and fringe benefits provided under their respective controlling collective bargaining agreement.

Mr. Paggi testified that during the period of the picketing he attempted unsuccessfully to contact the defendant's representative and contacted both V. J. Constanzi and delegates for the other trade unions involved on the job in the hopes of continuing with the excavating work, but that those attempts and contacts proved unavailing. He also stated that he had no conversations with defendant's representatives during that time. In August 1970, however, Woodcliff entered into a labor agreement with defendant union. Mr. Paggi testified that this agreement was the result of conversations in the summer of 1970 following the resumption of work with Mr. Davis, defendant's representative; that he and Mr. Davis never disagreed with regard to the contract; and that, generally, Woodcliff never rented any equipment from any concern or individual who did not use union operators. No testimony was elicited either on direct or cross-examinations of Mr. Paggi or Mr. Davis, whose testimony on behalf of defendant was unrelated to the liability issue, bearing on the contents of those conversations or the wages paid to those operators.

■ Although Woodcliff's unexplained signing of a labor agreement with defendant just three months after the cessation of the picketing might be considered to be suspicious, defendant failed to either discredit or rebut Mr. Paggi's testimony, which comprised the totality of the evidence proffered on the liability issue; this testimony was wholly consistent with a finding, and I so find, that the signing of the Woodcliff labor agreement was unrelated to any dispute, and that Woodcliff was a neutral employer at or about the time of the picketing.

The defendant's alleged but unsupported belief in a contrary finding is not a substitute for facts. The only evidence of any labor dispute in this case is one between defendant and plaintiff relating to the desire of defendant to cause plaintiff to sign an individual collective bargaining agreement containing a shop steward clause.

■ Since Woodcliff, a neutral employer, was not the target of a primary dispute with defendant and, instead, plaintiff, on whose construction site Woodcliff worked, was the focus, it follows that defendant's picketing at the Woodcliff gate was merely to further its dispute with plaintiff. Indeed, initially after the establishment of the Woodcliff gate, the picket signs continued to announce a dispute merely with plaintiff. It was not until four days subsequent thereto that the signs at the Woodcliff gate were rewritten to proclaim a dispute with Woodcliff, when the actual controversy continued to solely involve plaintiff. The mere appearance of a primary dispute with Woodcliff does not make it so. Considering all the facts and circumstances surrounding the picketing,[3] I conclude that the picketing at the Woodcliff gate was proscribed secondary activity calculated to induce plaintiff to recognize and bargain with defendant.

## DAMAGES

The Spackenkill high school building is a masonry wall-bearing structure which was constructed in three sections. Plaintiff claims that the delay in commencing the excavating of the site caused by the unlawful picketing resulted in its failure to roof the building prior to the onset of winter 1970–1971 as anticipated, thereby occasioning substantial expenditures for winter protection measures by which the masonry work on two of the sections was completed under tarpaulin tents temporarily heated by salamanders and bottled gas. Damages in the sum of $30,363.48 in labor costs, and $7,841.62 in materials for temporary heating and winterizing are sought. In addition, plaintiff seeks an amount in increased wages for masons under a new pay scale effective in July 1970, attorney's fees incurred in defending against the union pickets, $50,000 in additional labor, supervision and loss of productivity, $450 expended for the construction of signs, travel and telephone expenses, and $7,000 representing officers' and employees' time away from their jobs.

■ It is undisputed that all work at the job site ceased during the two-month period of the picketing and resumed on May 13, 1970, and that in September 1971 the school occupied the building even though the building was not substantially completed until the winter of 1971–1972. Mr. Warren, the architect on the Spackenkill project, testified that had the work commenced in

---

**3.** In this regard I note that the picketing of Woodcliff at the Woodcliff gate contravenes one of the criteria developed in *Sailors Union of the Pacific* (Moore Dry Dock Company), 92 N.L.R.B. 547 (1950) which presumptively validates common situs picketing if, *inter alia*, it is conducted in a manner which clearly indicates that the dispute is with the primary employer. Here the picketing does not so indicate, since it failed to identify plaintiff as the primary employer.

However, there is no evidence that plaintiff itself fully complied with the *Moore Dry Dock* standards, which additionally require limiting the situs of the dispute. In determining what constitutes a validly established separate gate for this purpose, the National Labor Relations Board has also required that the contractor establishing the gates notify the union of the restrictions placed on their use. *Daniel Construction Co.*, 192 N.L.R.B. No. 50 (1971). *See*

*Lawhon Construction Co. v. Carpet, L. & R.F.D., Local 1179*, 394 F.Supp. 520 (W.D.Mo. 1974), *aff'd* 513 F.2d 723 (8th Cir. 1975). Although evidence has been adduced indicating that Woodcliff was so notified, the record is silent as to notification of defendant union.

In any event, the *Moore Dry Dock* standards are evidentiary only, "to be employed in the absence of more direct evidence of intent and purposes of the labor organization." *NLRB v. Int'l Hod Carriers Local No. 1140*, 285 F.2d 397, 401 (8th Cir.), *cert. den.* 366 U.S. 903, 81 S.Ct. 1047, 6 L.Ed.2d 203 (1960). My inquiry is therefore focused on the totality of defendant's conduct in conducting the picketing to determine whether defendant acted with a proscribed secondary objective. *See Helgesen v. International Assoc. of Bridge, Structural & Ornamental Ironworkers, Local Union 498, supra*, at 183.

March, the general contractor could have substantially enclosed the building before the onset of winter weather, thereby obviating winter protection, but that, in a building such as that constructed, the winter deadline could not be met if the work, as it did, began in May. Mr. Warren, however, could not state with any certainty that the picketing was the sole factor preventing the enclosure of the building by December 1970. Indeed, the record reflects that the masonry work began on June 19, 1970, but that both the masons and laborers were on strike the first two weeks in July; there was also a shortage of mason manpower during the summer which precluded plaintiff from making up any lost time. Viewing the record as a whole, however, it cannot be gainsaid that these problems, encountered subsequent to the commencement of the project, were but minor compared to the initial two-month delay. As Mr. Rahm, the job foreman, testified, according to indications received from the business agent of the bricklayers union in March 1970, sufficient mason manpower would have been available had the job commenced two months earlier.[4]

Despite my finding that plaintiff is thus entitled to damages resulting from the delay, those damages must be proven ones, and it is here that plaintiff's proof substantially fails. To evidence the costs expended for winter protection, plaintiff has submitted a summary statement of its claim based on bills which the parties stipulated had been paid. This statement, totalling the demanded $7,416.62 and itemized per payee, is less than the totals shown on the face of the paid bills, indicating that only a portion of these bills represent claimed expenditures, notwithstanding that, with regard to some payees, all of the respective bills reflected winter 1970–1971 dates.[5] I therefore have no way of determining, nor has plaintiff so indicated, which sums represent amounts claimed. In view of this evidence, the only amount which plaintiff is entitled to with certainty is $1,340 expended for tarpaulins.

To evidence the $30,363.48 claimed for winter labor costs, plaintiff has again submitted a self-serving summary statement, indicating no time frame, computed on the basis of the contents of Mr. Rahm's diaries received in evidence. In addition, plaintiff offered proof of the total amount expended for pay for labor, as reflected on its books and records for the months of November 1970 through March 1971. An examination of Mr. Rahm's diaries reveals that they merely contain an indication of the number of various tradesmen on the job on any particular day; nowhere is there an indication of the amount of hours worked, or the hourly wage. Nor do the monthly totals reflect this information; indeed, there is no basis in these totals from which to infer the figure claimed. Plaintiff has thus failed to satisfy its burden of proof with regard to this amount.

These pay totals, moreover, do not substantiate plaintiff's claim for $50,000 in additional supervision, overhead and labor; and plaintiff has not come forward with any proof as to the factual basis for this claim. Nor has the plaintiff established any foundation whatsoever for the amounts claimed for employees' and officers' lost time, for the difference in pay expended under the masons new pay scale (if there be one), or any expenses for the construction of signs, travel or the like because of the picketing.

With respect to the amount claimed in attorney's fees, Mr. Velletri testified that in

4. I note that Mr. Rahm was engaged until May 1970 in the supervision of another of plaintiff's construction projects, the Zena School in Zena, New York. The record indicates, however, that he was merely "finishing up" that project and ready, willing and available to start the Spackenkill job, the job site which he visited in early March 1970. Indeed, a labor foreman had been designated on the Zena school job who was finishing when Mr. Rahm began his work in connection with the Spackenkill project in May 1970.

5. I note, however, that with respect to one of the payees, H. G. Page, for whose materials plaintiff claims $502.54, plaintiff has submitted bills reflecting materials furnished subsequent to the time period for which damages are claimed.

plaintiff's attempt to defend against the picketing, plaintiff contributed "about $1600" into a legal defense fund along with eight or nine other general contractors. Mr. Velletri further testified that he was the chairman of this fund. No documentary evidence of this amount was proffered; on the basis of Mr. Velletri's testimony, however, I am constrained to find that plaintiff has satisfied its burden of proof on this item. Plaintiff will be entitled to recover "about $1600"—actually, $1,583—for attorney's fees.[6]

■ On the record before me, then, plaintiff is entitled to recover $2,923 in damages for the items reflected above, in all other respects, plaintiff has failed in its burden of proving damages.

Settle judgment for plaintiff on three days' notice.

---

**6.** Plaintiff has submitted proposed findings of fact and conclusions of law. Finding No. 17(d) reflects the recovery of attorney's fees in the amount of $1,583.00. In light of Mr. Velletri's testimony concerning the amount expended, plaintiff's recovery on this item will be limited to that stated in Proposed Finding No. 17(d).