576 F.2d 471
 98 L.R.R.M. (BNA) 2569, 83 Lab.Cas. P 10,631
 Samuel M. KAYNARD, Regional Director of Region 29 of the
National Labor Relations Board, for and on Behalf
of the NATIONAL LABOR RELATIONS BOARD,
Petitioner-Appellant,
v.
LOCAL 282, INTERNATIONAL BROTHERHOOD OF TEAMSTERS,
CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA,
Respondent-Appellee.
 No. 574, Docket 77-6155.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 27, 1978.
Decided May 23, 1978.
 
 1
 Miriam B. Hartley, Atty., N. L. R. B., Washington, D. C. (Joseph E. Mayer, Asst. Gen. Counsel, John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Harold J. Datz, Asst. General Counsel, N. L. R. B., Washington, D. C., on brief), for petitioner-appellant.
 
 
 2
 J. Warren Mangan, Long Island City, N. Y. (O'Connor, Quinlan & Mangan, P.C., Long Island City, N. Y., on brief), for respondent-appellee.
 
 
 3
 Before LUMBARD and MULLIGAN, Circuit Judges, and BRYAN, Senior District Judge.
 
 
 4
 FREDERICK van PELT BRYAN, Senior District Judge:*
 
 
 5
 On this appeal we address the question whether a union engages in an illegal secondary boycott when it strikes against a general construction contractor in order to compel the contractor to give members of the striking union work currently done by employees of a subcontractor.[1] Judge Weinstein of the Eastern District found no reasonable cause to believe that Local 282, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Local 282) had violated the prohibition on secondary boycotts, 29 U.S.C. § 158(b)(4)(B), when it struck John T. Brady, Inc. (Brady). The court based its ruling on a finding that the union's actions had not been directed at a third party and thus fell within the statutory protection for primary activity. See 29 U.S.C. § 158(b)(4)(B). Nonetheless, the court preliminarily enjoined Local 282 from any further striking or picketing on Brady's construction site, finding that Local 282's actions had had the object of requiring Brady to assign particular work to employees represented by Local 282, and therefore had been in violation of 29 U.S.C. § 158(b)(4)(B).
 
 
 6
 Samuel Kaynard, Regional Director of Region Twenty-nine of the National Labor Relations Board appeals from the order of the district court insofar as it does not include an injunction against § 8(b)(4)(B) violations by Local 282. Furthermore, the NLRB complains that the scope of Judge Weinstein's injunction was too narrow and that the court improperly assigned work among the unions on the Brady construction site. We agree with the Board that the district court had reasonable cause to believe that Local 282 had violated § 8(b)(4)(B). We also conclude that the injunction's protections should have been broader in their scope and that the district court improperly included within its order provisions assigning work among the unions on the construction site. We therefore reverse the district court's judgment in these respects and remand to the district court for appropriate modifications of its injunction.
 
 I. FACTS
 
 7
 Brady is the general contractor for construction of a United States Postal Service mail handling facility at John F. Kennedy International Airport in Jamaica, New York (J.F.K. site). Brady is party to a July 1, 1975, collective bargaining agreement known as the "High-Rise Contract" with Local 282; this agreement remains in effect until June 30, 1978. According to the terms of the High-Rise Contract all truck driving done on any construction site under Brady's management must be done by members of Local 282. Two exceptions to this general rule are expressly noted: First, Local 282 does not claim jurisdiction over vehicles driven by "mechanics and skilled tradesmen incidental to the trade itself with their hand tools of their trade"; second, the agreement allows persons not members of Local 282 to make deliveries to and pick ups from the construction site, provided these deliveries and pick ups are made to and from only one location at the site. The High-Rise Contract specifically provides that Brady may not subcontract truck driving work to any company not bound by the Brady-Local 282 agreement.[2]
 
 
 8
 On March 8, 1977, Brady subcontracted to Active Fire Sprinkler Corp. (Active), a manufacturer and installer of automatic fire sprinkler systems, all plumbing and fire protection work for Brady's project at the J.F.K. site. Active's plumber employees, under an August 8, 1975, collective bargaining agreement, are represented by Plumbers Local Union No. 1 of Brooklyn and Queens (Local 1); its truck driving employees are members of Local 918, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Local 918), whose collective bargaining agreement was entered into with Active on August 18, 1974. None of Active's employees are represented by Local 282, nor is Active a party to the High-Rise Contract. Moreover, nothing in Active's subcontract with Brady provides that the plumbing contractor is subject to the general contractor's agreement with Local 282.
 
 
 9
 In addition to Active, two other subcontractors Burmar Electric Corp. (Burmar) and Novid Corp. (Novid) are present on the J.F.K. site. The record does not show that any of Burmar or Novid's employees belong to Local 282.
 
 
 10
 Since it entered the J.F.K. site in March 1977, Active has used three types of drivers to transport its materials to and around the site. For deliveries, Active uses both its own drivers (represented by Local 918) and independent drivers (not represented by any union). These drivers deliver loads of pipe and other materials from Active's main office in Brooklyn and from independent suppliers around the country to various points on the J.F.K. site: Some deliveries are made to a single storage facility on the site; other deliveries are made directly to some or all of the twenty-two locations at which Active is performing work on the project. In addition to using the unrepresented drivers and those represented by Local 918, Active has its plumber employees (who are represented by Local 1) use Jeep trucks to transport materials, men, and small tools between the central supply facility on the site and the twenty-two working locations.[3]
 
 
 11
 On March 22, 1977, Local 282's business agent informed Active's superintendent that single deliveries to more than one location on the construction site violated the High-Rise Contract. When Active ignored this warning, the Local 282 representative, on March 23, said that, although the union "couldn't do anything to (Active)," it would "get" Brady. Thereafter, until July 1, 1977, a Local 282 shop steward regularly followed Active's trucks around the construction site observing their movements. During April and May of 1977 Local 282 representatives also routinely stopped all Active trucks coming onto the J.F.K. site, demanded to see the drivers' union cards, and informed the drivers that deliveries could be made only to single locations on the construction site. Moreover, Local 282's business agent repeatedly urged Active's superintendent to hire members of Local 282 to drive Active's Jeep trucks around the site. But Active rebuffed all attempts by Local 282 to alter Active's method of transporting materials.
 
 
 12
 Having failed to induce Active to employ Local 282 members as truck drivers, Local 282 shifted its attention to Brady. Thus, on May 21, 1977, the Local 282 business agent approached Louis Ferrari, Brady's general superintendent, and demanded that Brady add a Local 282 member to its payroll to make up for Active's refusal to hire members of Local 282; Ferrari refused. Thereafter, from May 21 until June 15, a Local 282 member unsuccessfully applied every day for work as Active's truck driver on the J.F.K. site. At the same time Brady, acting through Ferrari, began to urge Active's President to hire Local 282 members to drive the subcontractor's trucks. Further, Ferrari attempted to enlist Local 1's business agent in the campaign to coerce Active to change its policy. Thus, in early June Local 1's business agent, at the urging of Ferrari, met with a representative from Local 282, who told him that Local 282 could "make Active sign an agreement with (Local) 282 through Brady."
 
 
 13
 After both direct and indirect attempts to coerce Active to hire Local 282 members had failed, on the morning of June 16 Local 282 put a picket line at the only gate to the J.F.K. site, resulting in the cessation of work by all Brady, Burmar, and Novid employees. Later in the day, Local 282 took its complaints to the Local 282-Building Contractors Association Joint Trade Board (Trade Board), the body to which initial resort is to be had under the High-Rise Contract. The Trade Board ruled that any truck driving done on the J.F.K. site, other than the initial drop of materials at a single location, had to be done by Local 282 members; accordingly, the Trade Board ordered Brady to place truck drivers from Local 282 in each of Active's trucks.[4]
 
 
 14
 Late in the afternoon of June 16, Local 282 removed the picket line at the J.F.K. site and work resumed when the union was told that Brady intended to comply with the mandate of the Trade Board. To that end, Brady unsuccessfully tried once again to persuade Active to hire a Local 282 member for the J.F.K. site; failing that, Brady itself hired a member of Local 282 and voluntarily gave him seventeen days' backpay, covering the days he had reported to Active and was denied work driving the subcontractor's truck. After threatening on June 27 to renew its strike because of Brady's failure to secure compliance with the Trade Board's directive,[5] Local 282 placed a picket line at the J.F.K. site once again on June 28, thereby stopping work by Brady, Burmar, and Novid employees. In order to end the strike, on June 30 Brady suspended for three weeks all work by Active on the J.F.K. site; the picketing ceased on July 1, 1977. Active remained off the construction site until July 21, 1977, when Judge Weinstein granted a temporary restraining order against further picketing by Local 282.
 
 
 15
 On June 29, 1977, Active filed unfair labor practice charges against Local 282 with the Regional Office of the NLRB, claiming that the union had been violating § 8(b)(4)(B) and (D) of the NLRA. After investigating the charges, Regional Director Kaynard issued a complaint covering the § 8(b)(4)(B) violation,[6] and petitioned the district court to enjoin any further picketing of the J.F.K. site by Local 282, pending final adjudication by the NLRB of the § 8(b)(4)(B) and (D) charges.
 
 
 16
 On July 20, 1977, the district court held an evidentiary hearing on the Regional Director's request for an injunction under § 10 of the NLRA. By written opinion of August 1, 1977, Judge Weinstein granted part of the government's request: The court issued a preliminary injunction forbidding any picketing or strike by Local 282 designed to "force or require Brady or its subcontractor Active to assign the work of driving trucks at the J.F.K. site carrying materials from point to point within the job site to employees who are represented by (Local 282) rather than to employees who are represented by Local 1." The court based its injunction, however, on the § 8(b)(4)(D) violation alone, finding no reasonable cause to believe that Local 282's actions constituted secondary picketing prohibited by § 8(b)(4)(B). In addition, the court provided that Local 1 members could transport by truck only 25 pounds of lead in any one trip; anything beyond this must be done by cherry pickers or trucks driven by members of Local 282.
 
 
 17
 The NLRB appeals from the court's judgment insofar as it was not based on alleged violations of § 8(b)(4)(B) as well as § 8(b)(4)(D).[7] Moreover, the Board asks that we remove the restriction on the amount of materials that may be transported in trucks driven by members of Local 1 and that we expand the scope of the injunction to cover attempts by Local 282 to affect the assignment of work presently done on the J.F.K. site by members of Local 918 and unrepresented employees of Active.[8]II. DISCUSSION
 
 A. Secondary Boycott
 
 18
 § 10(l ) of the NLRA, 29 U.S.C. § 160(l ), provides that whenever the NLRB receives a charge that any person has violated § 8(b)(4)(B) of the Act, and a NLRB regional attorney, after an investigation, finds that there is reasonable cause to believe the charge is true,
 
 
 19
 he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred . . . for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter.
 
 
 20
 We have held that such requests for injunctive relief by representatives of the Board should be granted if: (1) deferring to the statutory interpretation and rational factual inferences of the Board, there is reasonable cause to believe that there has been a violation of the Act; and (2) the equitable relief requested is just and proper. See Danielson v. International Organization of Masters, 521 F.2d 747, 751 (2d Cir. 1975); Seeler v. Trading Port, Inc., 517 F.2d 33, 36 (2d Cir. 1975). Applying this standard to the case at bar, we conclude that the district court erred in refusing to enjoin Local 282 from committing further violations of § 8(b)(4)(B) of the Act.[9]
 
 
 21
 Appellee does not claim that granting the injunction against Local 282 was in any way unjust or improper; like the district court, appellee argues only that the strikes and picketing of Brady were not secondary activities and therefore were not in violation of § 8(b)(4)(B). The Supreme Court has said that a union's conduct violates § 8(b)(4)(B) if it is coercive, is "aimed directly at (parties) . . . not involved in the dispute," and is intended to force a neutral third party to cease doing business with another. See NLRB v. Local 825, International Union of Operating Engineers, 400 U.S. 297, 304, 91 S.Ct. 402, 27 L.Ed.2d 398 (1971).
 
 
 22
 Here there is little question that Local 282's actions in striking and picketing against Brady were coercive; indeed, they were successful inasmuch as they coerced the general contractor to hire an unnecessary employee and to ask Active to leave the construction site. Moreover, unlike the district court, we believe that the Regional Director was well justified in concluding that Local 282's actions taken against Brady were designed to alter Active's employment practices. From the beginning of troubles at the J.F.K. site, Local 282's attentions were directed toward Active with the single goal of compelling the subcontractor to alter its method of transporting materials on the site. As we have noted, Local 282's own representatives told representatives of both Local 1 and Active that Local 282 would reach Active through actions taken against Brady.
 
 
 23
 Local 282 argues that its strike and picketing were primary activities protected under § 8(b)(4)(B) because they had as their objective the enforcement of the High-Rise Contract between Brady and Local 282. The existence of a collective bargaining agreement, however, can never protect what is otherwise illegal secondary activity. See NLRB v. Local 638, Ass'n of Steam Pipefitters, 429 U.S. 507, 520-21, 97 S.Ct. 891, 51 L.Ed.2d 1 (1977). Thus, since Local 282's actions were "tactically calculated to satisfy (the union's) objectives elsewhere," National Woodwork Manufacturers' Assn. v. NLRB, 386 U.S. 612, 644, 87 S.Ct. 1250, 1268, 18 L.Ed.2d 357 (1967), no provision of the High-Rise Contract protects those actions from the prohibition of § 8(b)(4)(B).
 
 
 24
 In addition to being coercive and aimed at a third party, Local 282's conduct was designed to force Brady to "cease doing business" with Active. Only when Brady had ordered Active off of the construction site did Local 282 remove its pickets. Indeed, on appeal Local 282 urges that Brady could easily have remedied the labor dispute at the J.F.K. site by exercising the contractor's right under its contract with Active to terminate the latter's role in the project. Throughout its dealings with Brady and Active, Local 282 had made abundantly clear its intention that, absent Active's submission to the union's demands, Active be removed from the site. See NLRB v. Local 825, International Union of Operating Engineers, 400 U.S. 297, 304-05, 91 S.Ct. 402, 27 L.Ed.2d 398 (1971).
 
 
 25
 We conclude, therefore, that there is reasonable cause to believe that Local 282 violated § 8(b)(4)(B) of the Act when it took action against Brady.[10] The injunction of the district court accordingly must be modified to include a prohibition on any strike or picketing against Brady which has as its objective the coercion of Active either to alter its employment practices concerning on-site trucking or to leave the site. Any redress Local 282 may be entitled to for breach of the High-Rise Contract must be sought against Brady in a court of law not on a picket line.
 
 B. Local 918 and Unrepresented Employees
 
 26
 As we have noted, the district court's order forbad strikes or picketing by Local 282 only insofar as such activities have as their object forcing "Brady or its subcontractor Active to assign the work of driving trucks at the J.F.K. site carrying materials from point to point within the job site to employees who are represented by Local 282 rather than to employees who are represented by Local 1 " (emphasis supplied). The NLRB appeals from this order because of its limitation to activity aimed at reassignment from Local 1-represented employees to employees represented by Local 282. Rather, the Board argues, the injunction's protection should extend to Active employees represented by Local 918 and unrepresented truck drivers delivering Active materials as well as to those belonging to Local 1. We agree.
 
 
 27
 A review of the record shows that from the beginning of the troubles on the J.F.K. site Local 282 was concerned with all truck driving done for Active on the site. Representatives from Local 282 stopped unrepresented drivers and Active drivers belonging to Local 918 and insisted that anything more than deliveries to a single location on the site was illegal. In ruling on Local 282's complaint, the Trade Board made a general determination regarding truck driving on the J.F.K. site; it did not limit its attention to the Jeep trucks driven by Active employees represented by Local 1. Moreover, when the Board issued its determination under § 10(k) of the Act, 29 U.S.C. § 160(k), concerning assignment of work on the J.F.K. site, that determination applied to all drivers for Active, including those represented by Locals 1 and 918 and those not belonging to any union. We conclude, therefore, that Local 282's actions were directed toward reassignment of work presently performed by members of Local 918 and unrepresented employees as well as by members of Local 1. The order of the district court must be amended accordingly.
 
 C. Assignment of Work
 
 28
 Finally, the district court included as part of its order a provision that use of Jeep trucks on the J.F.K. site by members of Local 1
 
 
 29
 shall be limited to the transportation of 25 pounds of lead and pipe of a length not exceeding 5 feet for each pipe in any one trip. Other material transported on-site by Active shall be transported by "cherry-pickers" or by a member of (Local 282).
 
 
 30
 The NLRB appeals from this portion of the order which assigns specific work to members of a specific union, arguing that the authority to assign work is vested exclusively in the Board under § 10(k) of the Act.
 
 
 31
 Under § 10(k) of the NLRA, 29 U.S.C. § 160(k), whenever the Board receives a charge that a union has violated § 8(b)(4)(D) by attempting to coerce an employer into assigning specific work to members of a specific union, the NLRB must hear and determine the dispute out of which the charge has arisen. In NLRB v. Local 1212, Radio & Television Broadcast Engineers, 364 U.S. 573, 586, 81 S.Ct. 330, 338, 5 L.Ed.2d 302 (1961), the Supreme Court held that under § 10(k), "it is the Board's responsibility and duty to decide which of two or more employee groups claiming the right to perform certain work tasks is right and then specifically to award such tasks in accordance with its decision."[11]
 
 
 32
 On the record before it, the district court had no power to assign the work which was the subject of the dispute. The purpose of a preliminary injunction under § 10(l ) of the NLRA is to preserve the status quo in order to give the Board time to adjudicate fully the claims of the parties and take appropriate action. See Compton v. National Maritime Union of America, 533 F.2d 1270, 1276-77 (1st Cir. 1976); McLeod v. National Maritime Union of America, 457 F.2d 490, 496 (2d Cir. 1972). Here the district court's order prohibiting further strikes or picketing fully protected the status quo, and any further order was improper because unnecessary. We therefore reverse the district court's order insofar as it placed restrictions on the work to be assigned members of Local 1.
 
 
 33
 Reversed in part and remanded with instructions to amend the order of the district court in accordance with this opinion.
 
 
 
 *
 Senior District Judge of the Southern District of New York, sitting by designation. Judge Bryan had completed a draft of this opinion before his death on April 17, 1978. The appeal is being decided, pursuant to 2d Cir. R. § 0.14, by Judges Lumbard and Mulligan, who are in agreement
 
 
 [1]
 Among the constraints Congress has placed on the activities of labor organizations is § 8(b)(4)(B) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(b)(4)(B), which in part forbids unions from engaging in a strike or threatening, coercing, or restraining any person " . . . where an object thereof is . . . forcing or requiring any person to cease . . . doing business with any other person." By enacting this provision, Congress sought to prohibit "secondary boycotts," which occur whenever pressure is "brought to bear, not 'upon the employer who alone is a party (to a dispute), but upon some third party who has no concern in it' with the objective of forcing the third party to bring pressure on the employer to agree to the union's demands." NLRB v. Local 825, International Union of Operating Engineers, 400 U.S. 297, 303, 91 S.Ct. 402, 406, 27 L.Ed.2d 398 (1970) (footnote omitted)
 
 
 [2]
 In relevant part, the High-Rise Contract provides:
 SECTION 9 . . . 1. The driving of all trucks owned, operated or under the control of (Brady) shall be performed by employees of (Brady) and covered by this Agreement. . . . (Local 282) will not claim jurisdiction over those vehicles which are driven by mechanics and skilled tradesmen incidental to the trade itself with their hand tools of their trade only. In no event will men, material or equipment be transported in such vehicles.
 
 
 [2]
 The driving of all trucks at the site of construction in connection with work which (Brady) is contracted to be responsible for, manage, or perform, shall be performed by employees of (Brady) and covered by this Agreement, provided that (Brady) may contract or subcontract said work only to an employer or person who is party to or bound by this Agreement, regardless of past practice and custom. This section shall not apply to the driving of a truck entering or leaving the site of construction for the sole purpose of making a single delivery and/or single pick up from the construction site of materials, tools or personnel, provided such single delivery and/or pick up may be made only to (or from) a single location per delivery or pick up on the site
 
 
 [3]
 The record shows that lengths of pipe over five feet are transported within the construction site only by cherry pickers, a type of small mobile crane. Cherry pickers on J.F.K. site are operated by Brady employees represented by Local 15, Operating Engineers. There appears to be no dispute regarding transportation of materials by cherry picker on the J.F.K. site
 
 
 [4]
 The Trade Board refused, however, to grant the union's request that back pay be given the Local 282 member who had reported for work and been denied a job as Active's truckdriver each day between May 22 and July 1, 1977
 
 
 [5]
 After receiving Local 282's threat to strike, Brady filed with the NLRB an unfair labor practice charge, claiming that the union was violating § 8(b)(4) (D) by attempting to force Brady to assign work to Local 282 drivers. This charge was later withdrawn
 
 
 [6]
 The Regional Director's complaint covering the § 8(b)(4)(D) charge was held in abeyance pending the outcome of NLRB proceedings under § 10(k), 29 U.S.C. § 160(k). On December 14, 1977, the Board issued its decision in the § 10(k) proceeding, finding that Active's employees and not Local 282 members were entitled to the disputed work. Local 282; International Brotherhood of Teamsters (Active Fire Sprinkler Corp.), 223 NLRB No. 166 (Dec. 14, 1977)
 
 
 [7]
 Because Local 282's actions against Brady have largely been aimed at achieving reassignment of work currently done by Active employees, the injunction of the district court against § 8(b)(4)(D) violations reaches, in large part, potential violations of § 8(b)(4)(B) as well. Often the application of § 8(b)(4)(B) overlaps in this way with that of § 8(b)(4)(D). See, e. g., NLRB v. Local 825, International Union of Operating Engineers, 400 U.S. 297, 305-06, 91 S.Ct. 402, 27 L.Ed.2d 398 (1971). At oral argument we were told that, although the NLRB acknowledges that the injunction as it now stands will suppress most potential difficulties on the J.F.K. site, it was appealing out of concern for the harmful precedent set by the district court's ruling. In addition to such considerations, we find it necessary to review the claimed § 8(b)(4)(B) violation because circumstances might develop in which Local 282's secondary purpose would be other than work reassignment. Alternatively, the Board might finally adjudicate the claim under § 8(b)(4)(D) thereby dissolving the injunction before reaching the claim under § 8(b)(4) (B). In either case, an injunction against § 8(b)(4)(B) violations would have a different effect than one against § 8(b)(4)(D) violations
 
 
 [8]
 Although Local 282 filed no notice of cross appeal, it would have us review and reverse Judge Weinstein's finding of reasonable cause to believe the union had violated § 8(b)(4)(D). Because of the union's failure to comply with F.R.A.P. 4, this issue is not properly before us. In any event, the record amply supports the district court's finding that Local 282, in striking and picketing against Brady, sought to coerce an employer to assign particular work to members of a particular union. Thus, there was reasonable cause to believe there had been a violation of § 8(b)(4)(D)
 
 
 [9]
 On appeal, the question whether there is reasonable cause to believe an unfair labor practice has been committed is one of law subject to appellate review. See Danielson v. Joint Board of Coat, Suit & Allied Garment Workers Union, 494 F.2d 1230, 1244 (2d Cir. 1974)
 
 
 [10]
 We note that, since the time Judge Weinstein entered his order, an Administrative Law Judge has reviewed the record and issued an opinion finding that Local 282 violated § 8(b)(4)(B) when it struck against Brady. Local 282, IBT (Active Fire Sprinkler Corp.), JD-164-78 (March 22, 1978)
 
 
 [11]
 The Board urges us to extend the Supreme Court's analysis to give the NLRB the exclusive right so to assign work tasks. We need not decide whether there ever may be circumstances in which a district court may temporarily assign work over which there is a dispute, as we hold only that these are not such circumstances