

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-11-2009

# NLRB v. Metro Regional Cncl

Precedential or Non-Precedential: Non-Precedential

Docket No. 07-4679

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"NLRB v. Metro Regional Cncl" (2009). *2009 Decisions.* Paper 1755.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1755

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 07-4679

———

NATIONAL LABOR RELATIONS BOARD,

Petitioner,
v.

METROPOLITAN REGIONAL COUNCIL OF CARPENTERS, SOUTHEASTERN
PENNSYLVANIA, STATE OF DELAWARE AND EASTERN SHORE OF
MARYLAND, UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF
AMERICA,

Respondent.

———

On Application for Enforcement of Order of the National Labor Relations Board
(Board Case Nos. 4-CC-2463, 4-CC-2482)

———

Submitted: February 3, 2009

Before: McKEE, STAPLETON, *Circuit Judges*, and IRENAS,* *Senior District Judge*.

(Filed : March 11, 2009)


Meredith L. Jason, Esq.
Linda J. Dreeben, Esq.
Edward Holzwanger, Esq.
National Labor Relations Board

———

* Honorable Joseph E. Irenas, Senior United States District Judge for the District
of New Jersey, sitting by designation.

1099 14th Street, N.W.

Washington, DC 20570

Counsel for Petitioner

Stephen J. Holroyd, Esq.
Jennings Sigmond, P.C.
The Penn Mutual Towers, 16th Floor
510 Walnut Street
Philadelphia, PA 19106

Counsel for Respondent

---

OPINION

---

**IRENAS**, Senior United States District Judge.

Before the Court is the application of the National Labor Relations Board ("Board") for enforcement of a cease-and-desist Order issued against the Metropolitan Regional Council of Carpenters, Southeastern Pennsylvania, State of Delaware and Eastern Shore of Maryland, United Brotherhood of Carpenters and Joiners of America ("the Union"), on October 18, 2007. The Order adopted the administrative law judge's ("ALJ") determination that the Union had violated Section 8(b)(4)(ii)(B) of the National Labor Relations Act ("Act"), 29 U.S.C. § 158(b)(4)(ii)(B), and his recommendation that a broad order be issued. The Union argues that there was insufficient evidence to support the Board's finding that the Union had violated Section 8(b)(4)(ii)(B) and that the

2

Board's issuance of a broad order was an inappropriate remedy. For the reasons set forth below, the Board's application for enforcement will be granted.[1]

## I.

## A.

Case 4-CC-2463 arises out of statements made by Bruce Jones ("Jones"), an official of the Union, to Todd Strine ("Strine"), a principal of 421 Chestnut Partners, LP ("CPLP") on May 3, 2006. CPLP was the developer for a project involving the conversion of an old bank building at 421 Chestnut Street in Philadelphia into residential condominium units. (App. 180.) While CPLP would be delivering "raw space" to the individual owners, they subcontracted out the work to be performed on the infrastructure to two companies, Cyma Builders and Aloia Construction. (App. 180-81.) Both of these contractors used "98% union labor." (App. 182.) However, two of the individual condominium owners contracted with Adams-Bickel Associates, Inc. ("Adams-Bickel") to do the work in their units. (App. 182.)

In late April 2006, members of the union representing the employees working on the elevators picketed at the Chestnut Street site. (App. 183.) Shortly thereafter, Strine received several telephone messages from Jones. (App. 183.) On May 3, 2006, Strine returned Jones's calls, at which point Jones identified himself as Union official and told

[1] This Court has jurisdiction pursuant to 29 U.S.C. § 160(e).

3

Strine he wished to discuss the Chestnut Street project. (App. 183.) Jones noted the picketing by the elevator workers, and then switched topics, stating, "What if out of the blue, Adams-Bickel is going to be my [Jones's] problem regardless[?]" (App. 183-84.) When asked why, Jones explained that it was because Adams-Bickel used "unfair contractors" who did not pay "the prevailing wages." (App. 184.) After discussing the concept of unfair wages, Jones told Strine that he believed Adams-Bickel was using unfair contractors, and "[i]f that's the way it's going to go the building is going to have a problem." (App. 184-85.) When Strine asked what he meant, Jones explained that, "a problem" meant "[p]rotests, work stoppages and problems with deliveries." (App. 185.)

Strine asked how these "problems" could be avoided, and rather than directly answering, Jones indicated that the problems went beyond the Union, and that there were potential difficulties involving other unions as well. (App. 185.) Strine suggested that Jones speak to someone at Adams-Bickel about his concerns. (App. 185-86.) Jones responded that he had spoken to someone there, but that "he had to watch what he said" to the Adams-Bickel principal. (App. 186.) Jones further stated, "if Adams-Bickel is in there and there's going to be a fight, it's going to go one way and it's not going to be a good way." (App. 187.) Strine explained that he had nothing to do with Adams-Bickel and that his own contractors had used union employees. (App. 187.) Jones responded that "We know that you initially did the right thing and we just want you to use some of your juice to convince Adams-Bickel to use fair contractors." (App. 187.)

4

Strine expressed confusion as to why the actions of individual owners were of such concern, given that the majority of the work had been done with union labor. (App. 187.) Jones explained that, "It's about upholding wages in the city of Philadelphia, which we set." (App. 188.) Finally, Strine told Jones, "I don't understand where we're going with this conversation or what you want me to do." (App. 188.) Jones then concluded the conversation by reiterating that, "I want you to think about using your juice and talking to Adams-Bickel." (App. 188.)

Strine and Jones had no further communications. Adams-Bickel filed a charge with the Board on May 5, 2006, alleging that Jones's conversation with Strine constituted threats in violation of Section (8)(b)(4)(ii)(B). (App. 23.) A complaint was issued on June 19, 2006, and amended on December 2, 2006. (App. 23.)

**B.**

Case 4-CC-2482 arises out of statements made by Jones to George McCardle ("McCardle"), a field superintendent at Penn Valley Constructors, Inc. ("Penn Valley"), on December 5, 2006. Penn Valley was the general contractor for a brewery construction project at Second and Chestnut Streets in Philadelphia. (App. 228-29.) Penn Valley subcontracted out all of the work, and all of the subcontractors working at the job site used union labor. (App. 229.) Penn Valley also subcontracted with American Millwork Cabinetry, Inc. ("American Millwork"), a non-union firm, to manufacture the cabinetry, bar tops and fronts, and wall panels for the brewery. (App. 229.) American Millwork

5

then subcontracted with P.A. Fly Contracting, Inc. ("PA Fly"), a union firm, for the delivery and installation of those items. (App. 212-13.)

In late 2006, a Union representative contacted George Reitz ("Reitz"), the owner of American Millwork, to find out if American Millwork was doing work at the Penn Valley project. Reitz explained American Millwork was only providing woodwork for the microbrewery. (App. 214.) Reitz was asked if American Millwork had a labor agreement, to which Reitz said no.[2] (App. 214.) The Union representative also asked who would be doing the installation, and Reitz provided a list of potential subcontractors, all of whom were unionized. (App. 214.)

On December 5, 2006, Jones contacted Reitz, on behalf of the Union. (App. 215.) Jones accused Reitz of not paying his workers "fair wages," and explained that "he was going to instruct his carpenters not to unload any millwork, because it was coming from an open shop and he repeated by saying that [no] millwork was going to be unloaded unless it was from a union." (App. 215.)

Later that day, Jones approached McCardle at Penn Valley's work site. (App. 230.) According to McCardle's testimony,

> [Jones] told me that . . . he and another business agent who represents the Cabinet Makers, were in contact with George Reitz from American Millwork and that George was jerking them around . . . . I said, "What do you mean by

---

[2] The Union first attempted to unionize the employees of American Millwork in late 2005, but was unsuccessful, purportedly due to a plant fire and other financial difficulties at American Millwork. (App. 215, 219-22.)

6

'jerking him around–jerking you around?'" And he said, "Let me put it this way . . . I just want to give you a heads up . . . and frankly I shouldn't even be saying this to you but if an agreement isn't worked out between American Millwork and the Union the truck's not getting unloaded." And he said–then he said, "Let me put it this way, if–my men are not going to unload that truck if something's not worked out between American Millwork and the Union." Then he asked me to call George Reitz and see if there was something I could do about it.

(App. 231.)

Following his conversation with Jones, McCardle did contact Reitz to discuss American Millwork's upcoming delivery. (App. 231.) Penn Valley filed a charge with the Board on December 7, 2006. (App. 26.) The delivery was originally scheduled to take place on December 11, 2006, but was delayed out of fear that Union picketing would halt all work at the project site. (App. 231.) The complaint was filed on December 26, 2006, alleging that Jones's conversation with McCardle on December 5, 2006, constituted unlawful secondary activity. (App. 26.) The Union answered on December 29, 2006. (App. 34.) On January 3, 2007, American Millwork attempted delivery of their products, but two men stationed themselves outside the entrance to the brewery with picket signs stating, "American Millwork is unfair to local . . . Carpenter's Council." (App. 231-32.) As a result, all other employees refused to cross the picket line and the truck had to leave without being unloaded. (App. 233.) Successful delivery was finally made on January 11, 2007, but only after American Millwork threatened PA Fly with breach of contract. (App. 9.)

## C.

The two cases were consolidated on January 29, 2007, and tried before ALJ Paul

Buxbaum on March 15, 2007. Strine, Rietz, and McCardle testified at the trial. Jones

was present at the hearing, but neither the General Counsel, nor the Union elected to call

him as a witness. The ALJ issued his decision on June 1, 2007, finding that Jones

threatened Strine and McCardle in violation of Section 8(b)(4)(ii)(B) of the Act. *See*

*Metro. Reg'l Council of Carpenters*, 351 N.L.R.B. No. 51, at *11-12 (2007). The ALJ

then turned to the question of an appropriate remedy and examined the Union's extensive

history of Section 8(b)(4)(ii)(B) violations, summarized below.[3]

Between the summer of 1999, and June, 2007, there were twelve complaints filed

against the Union for violations of the Act that resulted in orders against it. During the

summer of 1999, the Union used a sound amplification system at excessive volume levels

at the Society Hill Towers Owners' Association construction project designed to force

Society Hill to cease doing business with the Smucker Company. Also in the summer of

1999, the Union engaged in similar unlawful secondary activity directed at the Carlisle

Construction Company and Rittenhouse Regency Affiliates. The Union's objective was

to cause these companies to cease doing business with Nytech, a firm performing window

replacement work on their respective premises. The Union's agent called the property

manager of the apartment building warning that, "if [they] didn't use his men there, that

---

[3] A complete discussion of the Union's extensive history of violating the Act can be found at *Metro. Reg'l Council of Carpenters*, 351 N.L.R.B. No. 51, at *13-17.

he would have 100 of his men show up at the job and there might be trouble." *Metro. Reg'l Council of Phila. & Vicinity, United Bhd. of Carpenter & Joiners of Am. (Society Hill Towers Owners' Assn.)*, 335 N.L.R.B. 814, 820 (2001), *enforced* 50 Fed. App'x 88 (3d Cir. 2002).

On September 14, 1999, the General Counsel issued a complaint, and on March 17, 2000, an ALJ found that the Union's conduct at each work site had violated Section 8(b)(4)(ii)(B) of the Act, and recommended imposition of a cease-and-desist order. *Society Hill Towers Owner's Assn.*, 335 N.L.R.B. at 829 (Case 4-CC-2247). The Board issued the order on August 27, 2001, and it was subsequently enforced by this Court on October 30, 2002. *See Society Hill Towers Owner's Assn.*, 50 Fed. App'x 88.

In January, 2001, while that litigation was continuing before the Board, the Union engaged in unlawful secondary activity directed at Adams-Bickel, by picketing at a Commerce Bank job site where Adams-Bickel was the general contractor. The object of the Union's picketing was to force Adams-Bickel to cease doing business with one of its subcontractors, Hi-Tech Interiors, LLC. (App. 87-88 (Case 4-CC-2308).)

Barely more than two months after the Board issued its decision in *Society Hill Towers Owners' Association*, on November 2, 2001, an agent of the Union threatened a general contractor, Cutler Associates, Inc., that it would picket the company's job site with the objective of forcing Cutler to cease doing business with one of its subcontractors, Vision Contract Flooring, Inc. On the three days immediately following this

conversation, the Union did picket at the job site with the purpose of threatening, coercing, and restraining Cutler, R & S Electric Company, and Adams-Bickel. The complaint involving the Union's conduct at the Cutler job site was issued on November 21, 2001. (App. 92-94 (Case 4-CC-2341-2).)

Just over six weeks later, on January 7, 2002, the Union engaged in restraint and coercion of employees of Charles A. Higgins & Sons, Inc., and Mustang Expediter, at a job site in Bensalem, Pennsylvania. This activity violated of Section 8(b)(1)(A) of the Act.[4] (App. 89-91 (Case 4-CB-8807).)

A month after these events, on February 8 and 11, 2002, the Union engaged in secondary picketing at a job site involving the renovation of a United States Army Reserve Center with the objectives of forcing Harkins & Harkins Mechanical Services, Inc., to cease doing business with USA Environmental Management, Inc., and forcing USA Environmental to cease doing business with Boncouer Construction Company. A complaint alleging this misconduct was issued February 27, 2002. (App. 101-03 (Cases 4-CC-2350-1 and 4-CC-2350-2).)

A week after the issuance of this complaint, on March 7, 2002, the Union engaged in unlawful secondary picketing at a Burger King restaurant with the objective of forcing

---

[4] We agree with the ALJ and the Board that, in light of "the totality of the circumstances" analysis required set forth in *Five Star Manufacturing, Inc.*, 348 N.L.R.B. No. 94, 1301 (2006), it is appropriate to include this violation in examining the Union's proclivity determination for violating the Act. *See Metro. Reg'l Council of Carpenters*, 351 N.L.R.B. No. 51, at n.25.

the Burger King Corporation to cease doing business with A.E. Manning, Inc. (Case 4-CC-2357, App. 95-97.) The General Counsel issued complaints against the Union on March 14, and May 17, 2002. (App. 89-91 (Case 4-CB-8807); App. 95-97 (Case 4-CC-2357).)

Then, on July 2 and 3, 2002, the Union engaged in unlawful picketing at a building renovation project located at Tenth and Berks Street, blocking ingress to that site. An object of this secondary activity was to force Roosevelt, Inc., d/b/a Philadelphia Management to cease doing business with Diamond Contract Flooring. (App. 98-100 (Cases 4-CB-8886 and 4-CC-2366).)

On August 20, 2002, the parties entered into a settlement stipulation designed to resolve the aforementioned allegations in Cases 4-CC-2308, 4-CC-2341-2, 4-CB-8807, 4-CC-2357, 4-CB-8886, and 4-CB-2366. It provided for issuance of narrow cease-and-desist orders and the posting of notices.[5] (App. 63-86.) On April 8, 2004, the Board approved the settlement stipulation and issued an appropriate order. (App. 49-62.) On September 30, 2004, this Court enforced the Board's Order. (App. 40-48; *NLRB v. Metro. Reg'l Council of Phila. & Vicinity, United Bhd. of Carpenters & Joiners of Am.*,

_____

[5] The settlement stated that the Union "agrees that for the purposes of determining the proper scope of an order to be entered against it in any future proceeding before the Board or a Court in which the Board or its General Counsel is a party, the Board Order and Court Judgment issued pursuant to this Stipulation shall have the same force and effect as a litigated adjudication of the Board enforced by a U.S. Court that" the Union engaged in the alleged conduct. (App. 76.)

11

No. 04-2795 (3d Cir. Sept. 30, 2004).)

From July 2002 through September 2004, the Union did not engage in similar unlawful activities. However, commencing on October 1, 2004, the Union engaged in "confrontational conduct" at the Springside School, including the massing of demonstrators, amplification of loud music, and aggressive handbilling. The purpose of this secondary activity was to force the Springside School to cease doing business with E. Allen Reeves, Inc. (App. 126-30 (Case 4-CC-2429).) The complaint was filed March 7, 2005, and the parties resolved the case by formal settlement stipulation on July 5, 2005, providing for the entry of a narrow cease-and-desist order and the posting of a notice.[6] (App. 119-25) The Board issued a Decision and Order effectuating the parties' settlement on June 9, 2006. This Court enforced the order on October 31, 2006. (App. 104-10; *NLRB v. Int'l Bhd. Of Elec. Workers, Local 98*, No. 06-4271 (3d Cir. Oct. 31, 2006).)

On January 17 and 20, 2006, approximately six months after entering the Springside School settlement, the Union engaged in picketing at a job site on Kimball Street in Philadelphia and at an office in Sicklerville, New Jersey. Among the objectives of this activity were to force East Coast Construction Services Corporation to cease doing business with Keniko Construction, Inc., to force D Construction to cease doing business

---

[6] This settlement contained language identical to that quoted in note 5, *supra*. (App. 121.)

12

with Ray Marasheski, Jr., t/a Marasheski Contractors, and to force Marasheski to cease doing business with East Coast Construction Services. (App. 153-60 (Case 4-CC-2450).) A complaint containing these allegations was filed February 16, 2006, and the parties resolved the case by entering into a formal settlement stipulation on May 11, 2006, providing for a narrow cease-and-desist order and the posting of a notice.[7] (App. 142-50.) The Board approved the settlement by Decision and Order dated August 1, 2006, (App. 136-41), and this Court enforced the order on October 31, 2006. (App. 131-35; *NLRB v. Metro. Reg'l Council of Carpenters*, No. 06-3790 (3d Cir. Oct. 31, 2006).)

The ALJ determined that a broad order was appropriate due to the Union's history of repeated violations of Section 8(b)(4)(ii)(B), Adams-Bickel's involvement in two of the Union's previous violations, and the Union's history of violating the Act while the charges from a previous violation were either still being litigated or subject to a recently entered enforcement order. *Metro. Reg'l Council of Carpenters*, 351 N.L.R.B. No. 51, at *17-18. On October 18, 2007, the Board adopted the ALJ's findings and recommendations in full and issued the broad Order. The Order required the Union to cease and desist from its activity against CPLP and PVC, as well as "In any other manner engag[ing] in conduct prohibited by Section 8(b)(4)(ii)(B) of the Act that is directed at neutral employers" with unlawful secondary objectives. *Metro. Reg'l Council of*

---

[7] This settlement also contained language identical to that quoted in note 5, *supra*. (App. 144-45.)

13

*Carpenters*, 351 N.L.R.B. No. 51 (2007).

## II.

This Court's review of Board orders is "highly deferential." *Trimm Associates, Inc. v. NLRB*, 351 F.3d 99, 102 (3d Cir. 2003). We "accept the Board's factual determination and reasonable inferences derived from [those] determinations if they are supported by substantial evidence." *Allegheny Ludlum Corp. v. NLRB*, 301 F.3d 167, 175 (3d Cir. 2002). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 181 (quoting *Citizens Publ'g & Printing Co. v. NLRB*, 263 F.3d 224, 232 (3d Cir. 2001)) (internal quotation marks omitted). "The Board's conclusions of law are entitled to respect if based upon a reasonably defensible construction of the Act." *NLRB v. Local 54, Hotel Employees & Restaurant Employees Int'l Union*, 887 F.2d 28, 30 (3d Cir. 1989).

Section 8(b)(4)(ii)(B) of the Act makes it unlawful for a union or its agent "to threaten, coerce, or restrain" a person with the objective of "forcing or requiring any person to cease using, selling, handling transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person or forcing or requiring any other employer to recognize or bargain with a [union]." 29 U.S.C. § 158(b)(4)(ii)(B). "The two prerequisites for the finding of an 8(b)(4)(ii)(B) violation are: (1) that a labor organization 'threaten, coerce or restrain any

14

person'; and (2) that an object of this conduct be to force one person to cease doing business with another person." *Sheet Metal Workers Local 27*, 321 N.L.R.B. 540, 547 (1996).

## A.

The Union argues that the Board's determination that the conversation between Strine and Jones violated Section 8(b)(4)(ii)(B) was not supported by substantial evidence. But the Union does not contest that Jones made the comments that Strine alleges, or challenge any of his testimony. Rather, the Union claims that Jones's statements were not actually threats, and even if they were, they were not threats by the Union. We disagree.

Jones stated that he, as a representative of the Union, had a problem with Adams-Bickel's use of "unfair contractors" (App. 183-84), and that "[i]f that's the way it's going to go the building is going to have a problem." (App. 185.) Jones even clarified that "a problem" meant "[p]rotests, work stoppages and problems with deliveries." (App. 185.) Furthermore, Jones suggested the way to avoid these "problems" was for Strine, as a principle of CPLP, "to use some of [his] juice to convince Adams-Bickel to use fair contractors." (App. 187.) The Board adopted the ALJ's conclusion that "Jones' [sic] warning of protests and delivery interruptions, coupled with his demand that Strine use his influence against the offending contractor hired by the condominium owners, constituted a blatant example of restraint and coercion of a neutral party in a labor

15

dispute." (App. 10.) As the ALJ correctly noted, this is not a case where there were merely vague references to "problems" or "trouble," but rather an explicit statement that "[p]rotests, work stoppages and problems with deliveries" were likely if CPLP did not act. As such, there is certainly substantial evidence that a threat was made.[8]

The Union also argues that there was not substantial evidence to support finding the Union intended an unlawful secondary objective. The ALJ found that "it is apparent from the words chosen that Jones' [sic] objective was to force CPLP to apply pressure to the condominium owners to cease using Adams-Bickel or other 'unfair' contractors to perform construction work on the Chestnut Street project." *Metro. Reg'l Council of Carpenters*, 351 N.L.R.B. No. 51, *9. Despite the Union's insistence to the contrary,

---

[8] The Union argues that Jones was not actually threatening Union action, but merely conveying the concerns of other unions working on the CPLP project. However, Jones's statement that the issues he was calling about "went beyond problems with the Carpenters Union" (App. 185) clearly indicates that the Union did have a problem with Adams-Bickel. There was certainly substantial evidence to support the ALJ's interpretation of the evidence before him.

The Union also argues that the General Counsel could not meet its burden of proof without calling Jones as a witness and that no adverse inference should be drawn by the ALJ from his failure to testify. There was ample evidence to support the Board's conclusion without Jones's testimony. Moreover, the ALJ merely noted Jones's failure to testify, and did not expressly draw an adverse inference. *Metro. Reg'l Council of Carpenters*, 351 N.L.R.B. No. 51, at n.6. But, "it is settled 'that when a party fails to call a witness who may reasonably be assumed to be favorably disposed to the party, an adverse inference may be drawn regarding any factual question on which the witness is likely to have knowledge." *Daikichi Corp.*, 335 N.L.R.B. 622 (2001), *enforced.* 56 Fed. App'x 516 (D.C. Cir. 2003) (quoting *Int'l Automated Machs.*, 285 N.L.R.B. 1122, 1123 (1987), *enforced. mem.* 861 F.2d 720 (6th Cir. 1988)). Therefore, even if the ALJ drew an adverse inference from Jones's failure to testify, the inference was justified.

16

Jones made it very clear that he wanted Strine pressure Adams-Bickel to use "fair contractors," and if he failed to do so, then there would be the "problems" discussed above. While the Union argues that Jones never told Strine that Adams-Bickel needed to be removed from the job site, the Supreme Court has held that a literal reading of the "cease doing business" requirement is too narrow, and "would ignore the original congressional concern." *NLRB v. Local 825, Int'l Union of Operating Eng'rs*, 400 U.S. 297, (1971). Asking Strine to use his "juice" is the type of conduct

> which in effect requires a neutral to alter or modify its existing business relationship with the primary employer, although arguably requiring less than a total cancellation of the business relationship, [and] is enough disruption of an existing business relationship to constitute a "cease doing business" object within the meaning of Section 8(b)(4)(B) of the Act.

*Local No. 441, Int'l Bhd. of Elec. Workers*, 222 N.L.R.B. 99, 100 (1976), *enforced* 569 F.2d 160 (D.C. Cir.1977).

The conversation with Strine can best be characterized as a progression from vague references to the Union's frustration with Adams-Bickel, to a threat of work stoppages and a "request" that Strine pressure Adams-Bickel to use union employees. This is precisely the type of conduct that "constitutes a deliberate entanglement of a neutral person in a dispute not his own and is violative of the secondary boycott provision of the Act." *Local No. 441, Int'l Bhd. of Elec. Workers*, 222 N.L.R.B. at 101. Given the unrefuted testimony about that conversation, there can be no question that the Board's finding that Section 8(b)(4)(ii)(B) is supported by substantial evidence.

17

**B.**

The Union argues that the conversation between Jones and McCardle was merely to inform McCardle of the conflict with American Millwork, and that there would be a picket line and work stoppages if a deal could not be reached. Jones told McCardle that "if an agreement isn't worked out between American Millwork and the Union the truck's not getting unloaded. . . . [M]y men are not going to unload that truck if something's not worked out between American Millwork and the Union." (App. 230-31.) He then asked McCardle to call Reitz and "see if there was something [McCardle] could do about it." (App. 231.) The ALJ and the Board determined that these statements "clearly establishe[d] that the Union's agent threatened to prevent the delivery of millwork to Penn Valley's project and demanded that Penn Valley intercede with its subcontractor to resolve [the Union]'s issues." *Metro. Reg'l Council of Carpenters*, 351 N.L.R.B. No. 51, at *10. However, the Union asserts that there was no violation and that the conversation was merely a prediction of what would happen if a "valid picket line was established." (Union Br. 22.)

The Union's argument hinges on its assertion that it had a right to picket when non-union labor was being employed, and that therefore any action associated with valid picketing does not violate the Act. However, "picketing for a lawful object may be unlawful if there is other evidence establishing that the picketing also has an unlawful secondary object." *Local No. 441, Int'l Bhd. of Elec. Workers*, 222 N.L.R.B. at 100.

18

"[T]he Act makes clear, a threat to shut down a general contractor's job in order to pressure a subcontractor to sign an agreement with a union covering the uncertified employees of the subcontractor is improper secondary conduct prohibited by the Act." *Operating Eng'rs Union Local No. 3*, 340 N.L.R.B. 1053, 1056 (2003) (citing *Local 825*, 400 U.S. at 304). In this case, the Union has conceded that "Jones was trying to put pressure on [Penn Valley] to get involved in the dispute and have [American Millwork] *sign an agreement.*" (Union Br. 24 n.18.) However, enlisting a neutral employer to exert pressure on the offending primary employer to negotiate with the Union is precisely the context which, "constitutes a deliberate entanglement of a neutral person in a dispute not his own and is violative of the secondary boycott provision of the Act." *Local No. 441, Int'l Bhd. of Elec. Workers*, 222 N.L.R.B. at 101. Even without the Union's concession, the ALJ's examination of the Union's history with American Millwork makes clear that the Jones was asking McCardle to pressure American Millwork into negotiating with the Union. As such, the Board's finding that the Union threatened Penn Valley with an unlawful secondary objective, thereby violating Section 8(b)(4)(ii)(B) of the Act, is supported by substantial evidence.

## III.

### A.

The Union argues that the record does not support the Board's issuance of a broad order. Section 10(c) of the Act, 29 U.S.C. § 160(c), vests the NLRB with "broad

discretion to devise remedies that effectuate the policies of the Act, subject only to limited judicial review." *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 898-99 (1984). We "should not substitute [our] judgment for that of the NLRB in determining how best to undo the effects of unfair labor practices." *Id.* at 899. "The NLRB's choice of a remedy must be given 'special respect by reviewing courts,' and must not be disturbed 'unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.'" *Quick v. NLRB*, 245 F.3d 231, 254 (3d Cir. 2001) (quoting *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 613 n. 32 (1969) and *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 216 (1964)).

A broad order is permissible when the enjoined violations "bear some resemblance to that which the [party] has committed or that danger of their commission in the future is to be anticipated from the course of [its] conduct in the past." *NLRB v. Express Pbl'g Co.*, 312 U.S. 426, 436 (1941). The Board has adopted the position that a broad order

> is warranted only when a respondent is shown to have a proclivity to violate the Act or has engaged in such egregious or widespread misconduct as to demonstrate a general disregard for the employees' fundamental statutory rights. Accordingly, each case will be analyzed to determine the nature and extent of the violations committed by a respondent so that the Board may tailor an appropriate order.

*Hickmott Foods, Inc.*, 242 N.L.R.B. 1357, 1357 (1979).

## B.

Despite its extensive history of Section 8(b)(4)(ii)(B) violations, the Union still contends that a broad order is not appropriate because its past activities were not "well-

20

settled" violations of the Act and cannot constitute "an attitude of opposition to the purposes of the Act." *Five Star Mfg., Inc.*, 348 N.L.R.B. at 1301. The Union states that "[v]iewing the 'totality of the circumstances' of this case, it is clear that [the Union] is an aggressive and creative union attempting to flex its collective muscle in an ever-restrictive environment." (Union Br. at 27.) However, the Board argues that a broad order was necessary in this instance precisely because the past conduct of the Union has indicated that it will likely continue to push the boundaries and find yet undiscovered ways to violate Section 8(b)(4)(ii)(B). *See Int'l Bhd. of Elec. Workers v. NLRB*, 341 U.S. 694, 706 (1951) ("When the purpose to restrain trade appears from a clear violation of law, it is not necessary that all of the untraveled roads to that end be left open and that only the worn one be closed."). We agree.

## C.

The Union cites *Electrical Workers Local 98 (The Telephone Man)*, a case in which the electrical workers' union had targeted "10 separate neutral employers in a 19-month period . . . demonstrat[ing the union's] proclivity for violating the Act and its general disregard for the fundamental rights of employees and neutral employers." 327 N.L.R.B. 593, 602 (1999). The Union argues that because its conduct in the instant case was not as egregious as the electrical worker's union in *The Telephone Man*, a broad order is not justified.

However, each case must be analyzed on its own facts. The Union has a long

21

history of violating Section 8(b)(4)(ii)(B) of the Act. Between 1999 and 2006 twelve complaints[9] have been filed resulting in orders enforced by this Court, affecting at least twenty-five primary and secondary employers in the greater Philadelphia area.[10] Additionally, several of the Union's violations occurred while litigating complaints of prior violations or shortly after this Court had enforced the Board's orders relating to prior violations. In the instant case, Jones telephoned Strine during the pendency of a complaint filed in February, 2006, (Case 4-CC-2450), and the threats made to McCardle were made during the pendency of the CPLP case, only five weeks after this Court entered two separate judgments enforcing orders against the Union. This conduct clearly constitutes substantial evidence of the need for a broad order.

Also noteworthy is that two of the complaints in 2001, cases 4-CC-2308 and 4-CC-2341-2, involved efforts by the Union to pressure Adams-Bickel, one of the charging parties in the case before us. Plainly, the narrow cease and desist orders entered in those cases have been ineffective in preventing the Union from later targeting that same company.

## D.

The Union claims any consideration of misconduct which occurred more than four

---

[9] Eleven of the complaints involved violations of Section 8(b)(4)(ii)(B), and one involved a violation of Section 8(b)(1)(A). *See* notes 3 and 4, *supra*.

[10] *See Metro. Reg'l Council of Carpenters*, 351 N.L.R.B. No. 51, at n.27 (listing all the employers affected by the Union's unlawful conduct in that time period).

years prior is improper when fashioning a remedy, and therefore only three of its previous violations should have been considered. The Union cites an earlier decision of ALJ Buxbaum where he stated, "[w]hile it has not articulated a precise time limit, the Board appears to draw the appropriate demarcation at the passage of approximately 4 years without evidence of misconduct." *Int'l Bhd. of Elec. Workers, Local 98 (Tri-M Group)*, 350 N.L.R.B. 1104 (2006). However, the Board expressly declined to recognize any such rigid time limitation. Instead, the Board explained that the propriety of a broad order is based on an assessment of the totality of the circumstances including the proximity or remoteness of the dates of prior unfair labor practices and related administrative and judicial orders. *Id.* at n.2.

## IV.

For the foregoing reasons, we find that substantial evidence supports the Board's determination that the Union violated Section 8(b)(4)(ii)(B) of the Act. Narrowly drawn orders have plainly failed to deter the Union's continued violations of Section 8(b)(4)(ii)(B). The broad order in this case directed the Union to cease and desist from "in any other manner engag[ing] in conduct prohibited by Section 8(b)(4)(ii)(B) of the Act." *Metro. Reg'l Council of Carpenters*, 351 N.L.R.B. No. 51. This is an appropriate remedy "to effectuate the policies of the Act." *Quick*, 245 F.3d at 254. The actions enjoined most definitely "bear some resemblance to that which the [party] has committed or that danger of their commission in the future is to be anticipated from the course of

23

[its] conduct in the past." *Express Pbl'g Co.*, 312 U.S. at 436. The Board's application for enforcement of its order will be granted.