FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SERVICE EMPLOYEES
INTERNATIONAL UNION LOCAL 87,
*Petitioner*,

v.

NATIONAL LABOR RELATIONS
BOARD,
*Respondent*,

PREFERRED BUILDING SERVICES,
INC.,
*Intervenor.*

No. 19-70334

NLRB No.
20-CA-149353

OPINION

On Petition for Review of an Order of the
National Labor Relations Board

Argued and Submitted September 16, 2020
San Francisco, California

Filed April 28, 2021

Before:  Paul J. Watford, Michelle T. Friedland, and
Eric D. Miller, Circuit Judges.

Opinion by Judge Watford

# SUMMARY[*]

## Labor Law

The panel granted a union's petition for review of a decision of the National Labor Relations Board ("the Board"), which held that janitorial employees had lost the protection of the National Labor Relations Act ("NLRA") due to unlawful picketing.

The janitorial employees cleaned an office building in San Francisco, California that was managed by Harvest Properties, Inc. Harvest hired Preferred Building Services to provide the janitorial services. The employees regarded Preferred as their principal employer. Several of the janitorial employees sought help from Service Employees International Union Local 87 in addressing their concerns about low wages and poor working conditions. The employees, joined by members of the Union, staged two pickets in front of the building's main entrance. After several janitorial employees were discharged, the Union filed a charge with the Board alleging Preferred engaged in unfair labor practices by discharging employees in retaliation for their picketing and union activity.

Section 8(b)(4)(ii)(B) of the NLRA does not prohibit unions from engaging in primary picketing – picketing aimed at the primary employer, but it does prohibit secondary picketing – picketing aimed at a neutral third party with the objective to force the third party to take action

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

to give the union leverage in its dispute with the primary employer.

The panel held that the Board erred in concluding on this record that the employees' picketing violated Section 8(b)(4)(ii)(B) of the NLRA. Specifically, the panel held that while the Union may have engaged in coercive activity (picketing and patrolling), the Board's finding that it constituted secondary, as opposed to primary, activity was not supported by substantial evidence. The combination of the picket signs and the leaflets, considered in their entirety, clearly disclosed that the employees' dispute was with Preferred and not with any of the buildings' tenants. Because the Union's picketing activity complied with the criteria in *Sailors' Union of the Pacific (Moore Dry Dock Co.)*, 92 N.L.R.B. 547 (1950), a rebuttable presumption arose that it was primary in character. The panel held that the Board failed to identify substantial independent evidence rebutting the presumption that the employees' picketing was lawful. The panel remanded to the Board for further proceedings.

## COUNSEL

P. Casey Pitts (argued) and Stacey M. Leyton, Altshuler Berzon LLP, San Francisco, California; Nicole G. Berner, Claire Prestel, and John M. D'Elia, Service Employees International Union, Washington, D.C.; for Petitioner.

Kellie Isbell (argued), Senior Attorney; Julie Brock Broido, Supervisory Attorney; David Habenstreit, Acting Deputy Associate General Counsel; Alice B. Stock, Associate General Counsel; Peter B. Robb, General Counsel; National Labor Relations Board, Washington, D.C.; for Respondent.

Charlotte Garden, Fred T. Korematsu Center for Law & Equality, Ronald A. Peterson Law Clinic, Seattle University School of Law, Seattle, Washington; Catherine L. Fisk, Berkeley, California; for Amici Curiae Labor Law Professors.

Jonathan C. Fritts, Michael E. Kenneally, and Richard J. Marks, Morgan Lewis Bockius LLP, Washington, D.C.; John C. Sullivan, Morgan Lewis Bockius LLP, Dallas, Texas; Daryl Joseffer and Jonathan D. Urick, U.S. Chamber Litigation Center Inc., Washington, D.C.; for Amici Curiae Chamber of Commerce of the United States of America, Coalition for a Democratic Workplace, Associated Builders and Contractors, National Retail Federation, and Retail Industry Leaders Association.

**OPINION**

WATFORD, Circuit Judge:

With the help of a union, janitorial employees picketed outside the commercial office building where they worked to protest their low wages and poor working conditions. The employees were fired as a result. The National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.*, ordinarily protects employees from being fired for engaging in concerted action to improve their wages and working conditions. But here, the National Labor Relations Board (the Board) held that the employees lost the protection of the NLRA because the picketing they engaged in was unlawful. The union that assisted the employees petitions for review of the Board's decision and asks that we reverse it. For the reasons that follow, we grant the union's petition.

I

The janitorial employees at the center of this dispute cleaned an office building located at 55 Hawthorne Street in San Francisco, California. The manager of the building, Harvest Properties, Inc., hired Preferred Building Services (Preferred) to provide janitorial services, which included cleaning the offices of the building's tenants. Preferred subcontracted the work to Ortiz Janitorial Services, a sole proprietorship owned by Rafael Ortiz (collectively, Ortiz). The administrative law judge (ALJ) who heard this case found that the employees were jointly employed by Preferred and Ortiz, a finding that we accept for purposes of this decision. As will be seen, the employees regarded Preferred as their principal employer, although Rafael Ortiz was the source of some of their workplace grievances.

In the fall of 2014, several of the janitorial employees sought help from Service Employees International Union Local 87 (the Union) in addressing their concerns about low wages and poor working conditions. Their workplace grievances included being subjected to sexually inappropriate comments from Rafael Ortiz on multiple occasions. For example, he repeatedly suggested that improvements in pay and working conditions were contingent on his female employees' having sex with him. The president of the Union suggested that the employees engage in a picket outside 55 Hawthorne Street to publicize their concerns, and the employees agreed.

On October 29, the employees staged the first of two pickets. Joined by members of the Union, the employees walked in a circle on the sidewalk in front of the building's main entrance. The picketers carried signs identifying Preferred as the target of their protest, with messages such as "PREFERRED BUILDING SERVICES UNFAIR!" and "WE *PREFER* NO MORE SEXUAL HARASSMENT." The picketers chanted slogans such as "Up with the union, down with exploitation," and "We want justice. When? Now." In addition, the picketers handed out leaflets to passersby, which stated in relevant part the following (the key language appears in italics):

Who Needs a Minimum Wage Increase?<br>We do.

*We work for Preferred Building Services which cleans the offices of KGO radio.* We get paid the San Francisco minimum wage of $10.74 per hour. We endure abusive and unsafe working conditions and sexual harassment. The work involves heavy lifting

and the risk of serious injury. A foreman arbitrarily cut hours from eight hours per day to six hours and said that any additional hours would need to include sexual favors. The company does not provide paid sick days that are required by San Francisco law or pay medical bills for injuries on the job as required by workers compensation.

*We are calling on KGO radio to take corporate responsibility in ensuring that their janitors* receive higher wages, dignity on the job, respect, their rights to sick pay and workers compensation, and full legal protections against sexual harassment and retaliation for asserting their rights.

Vote Yes on Prop J on Nov. 4 to raise the city minimum wage.
*Join us for a picket line outside the offices of KGO radio.*

Wednesday, October 29
10 a.m.
55 Hawthorne St, San Francisco

(Emphasis added.) In a meeting with the Union's president several days after the first picket, the employees reported that the building's tenants were "upset by what they had learned."

The second picket took place a few weeks later, on November 19. The picketers again walked in a circle on the sidewalk in front of the building's main entrance. They again carried signs, handed out leaflets, and chanted slogans.

The signs and slogans were substantially the same as before. So too were the leaflets, except that the sentence calling on KGO Radio to accept corporate responsibility was replaced with the following sentence: "We are calling on KGO radio and Cumulus Media as the major tenant[s] to help in getting Preferred Building Services to listen to our demands and not ignore us."

While the picketing on November 19 was underway, several of the employees, the Union's president, and a co-director of the San Francisco Living Wage Coalition met with Benjamin Maxon, the building manager for Harvest Properties. Maxon testified that, at the meeting, the Union's president "told us they were going to keep showing up until we made changes, more specifically to the wage." Maxon informed those present that Harvest was planning to transition away from Preferred to a unionized contractor.

That same morning, Maxon emailed Preferred's executive vice president, Pete Dellanini, to ask him what Preferred was doing to remedy the situation. In a telephone conversation that followed, Maxon told Dellanini that Rafael Ortiz needed to be banned from 55 Hawthorne Street while they investigated the allegations against him. Dellanini disagreed with Maxon about the appropriate course of action. About an hour later, Dellanini sent an email to Maxon terminating Preferred's cleaning contract with Harvest, effective 30 days hence. Preferred likewise terminated its subcontract with Ortiz for 55 Hawthorne Street, also effective 30 days hence.

On the evening of November 19, when two of the employees who participated in the picketing showed up for work, Ortiz fired them. In mid-December, when Preferred (and thus Ortiz) ceased providing janitorial services at

55 Hawthorne Street, Ortiz terminated two other employees who participated in the picketing.

The Union filed a charge with the Board alleging that Preferred and Ortiz had engaged in unfair labor practices by, among other things, discharging employees in retaliation for their picketing and union activity. After investigating the charge, the Board's General Counsel filed a complaint alleging that Preferred and Ortiz had engaged in unfair labor practices in violation of § 8(a)(1) and (3) of the NLRA. *See* 29 U.S.C. § 158(a)(1), (3).

The ALJ conducted an extensive evidentiary hearing during which the discharged employees, the Union's president, Maxon from Harvest Properties, Dellanini from Preferred, and Rafael Ortiz all testified. During the hearing, Preferred and Ortiz argued that the employees' picketing on October 29 and November 19 violated § 8(b)(4)(ii)(B) of the NLRA. (That provision prohibits so-called secondary picketing, the specifics of which we will discuss shortly.) The employees' unlawful conduct, Preferred and Ortiz contended, constituted an affirmative defense to the charges against them. The ALJ rejected that defense on the ground that the employees' picketing did not violate § 8(b)(4)(ii)(B). The ALJ further found that Preferred and Ortiz, as joint employers, had threatened and discharged the janitorial employees in retaliation for their picketing and union activity in violation of § 8(a)(1) and (3) of the NLRA. Among other relief, the ALJ ordered that the employees be reinstated with back pay.

Upon review of the ALJ's decision, the Board reached the opposite conclusion. It held that the employees' picketing violated § 8(b)(4)(ii)(B) and that, as a result of their participation in that unlawful activity, they lost the protection of the NLRA. The Board ordered the complaint

against Preferred and Ortiz dismissed in its entirety. The Union then filed this petition for review.

## II

## A

Although the parties have briefed a number of issues, the only one we need to address is whether the Board erred in concluding that the employees' picketing violated § 8(b)(4)(ii)(B). That provision prohibits various unfair labor practices, including what is known as "secondary picketing." The language relevant to the Board's determination provides:

> It shall be an unfair labor practice for a labor organization or its agents . . . (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where . . . an object thereof is . . . (B) forcing or requiring any person . . . to cease doing business with any other person . . . . *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.

29 U.S.C. § 158(b)(4)(ii)(B).

As the proviso makes clear, § 8(b)(4)(ii)(B) does not prohibit unions from engaging in *primary* picketing—that is, picketing "aimed at the employer with whom there is a primary dispute" (known in labor parlance as the primary employer). *NLRB v. Operating Engineers*, 400 U.S. 297, 303 (1971). Unions are free to engage in peaceful picketing with the objective of forcing the primary employer to meet

the union's demands, even when such conduct "may seriously affect neutral third parties." *Id.*; *see also National Woodwork Manufacturers Association v. NLRB*, 386 U.S. 612, 627 (1967). What the provision prohibits is *secondary* picketing—that is, picketing aimed at a neutral third party with the objective of forcing that party to take action that will afford the union leverage in its dispute with the primary employer. Section 8(b)(4)(ii)(B) thus reflects "the dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own." *NLRB v. Denver Building & Construction Trades Council*, 341 U.S. 675, 692 (1951).

A violation of § 8(b)(4)(ii)(B) has two elements. First, a labor organization must engage in conduct that coerces, threatens, or restrains a person engaged in commerce, typically a neutral employer not involved in the union's dispute. Second, an object of that conduct must be, as relevant in this case, to force or require the neutral employer to "cease doing business" with the primary employer. This second element does not require a showing that the union literally sought to force the neutral employer to terminate its business relationship with the primary employer. *Operating Engineers*, 400 U.S. at 304. The element is also satisfied when the union seeks to force the neutral employer "to bring pressure on the [primary] employer to agree to the union's demands." *Id.* at 303. Thus, picketing has an impermissible secondary object in violation of § 8(b)(4)(ii)(B)'s "cease doing business" element when it (1) is aimed at a neutral employer, and (2) seeks to force that employer either to cut ties with the primary employer or to pressure the primary employer into making changes to its labor policies. (One can think of the second element as itself having two subparts.)

As to the first element, the ALJ in this case held that the employees' picketing qualified as coercive conduct because it involved patrolling back and forth in front of the entrance to 55 Hawthorne Street.  The Board did not disturb that finding.  The Union and its supporting *amici* raise a serious First Amendment challenge to the ALJ's coercion determination, but the Board counters that the Union waived this challenge by raising it below for the first time in a motion for reconsideration.  We need not resolve either party's contentions concerning the coercion element because we conclude that the Board's finding as to the second element—that an object of the employees' picketing was to coerce neutral employers Harvest Properties and KGO Radio to "cease doing business" with Preferred—is not supported by substantial evidence.  *See* 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951).

B

Determining whether picketing has an impermissible secondary object can be tricky when, in cases like this one, the picketing occurs at a location occupied by both the primary employer and one or more neutral employers.  That was true here because the site of the picketing—55 Hawthorne Street—was not only a location where the employees' primary employer (Preferred) performed work, but also the location of the building's manager (Harvest Properties) and the building's tenants (such as KGO Radio).  Picketing outside the building's main entrance would thus be likely to draw the attention of both the primary and neutral employers.

To assist in distinguishing between permissible and impermissible picketing at a location shared by primary and neutral employers, the Board has developed a set of four criteria drawn from *Sailors' Union of the Pacific (Moore*

*Dry Dock Co.)*, 92 N.L.R.B. 547 (1950). Those criteria focus on whether: (1) "[t]he picketing is strictly limited to times when the situs of [the] dispute is located on the [neutral] employer's premises"; (2) "at the time of the picketing the primary employer is engaged in its normal business at the situs"; (3) "the picketing is limited to places reasonably close to the location of the situs"; and (4) "the picketing discloses clearly that the dispute is with the primary employer." *Id.* at 549. When each of these criteria is satisfied, a rebuttable presumption arises that the picketing constituted lawful primary activity. *See Electrical Workers v. NLRB*, 366 U.S. 667, 677 (1961).

The Board erred in its application of the *Moore Dry Dock* criteria in this case. No one disputes that the first three criteria were satisfied, but the Board concluded that the fourth criterion was not. The Board predicated this conclusion on the thinnest of reeds. It conceded that the *signs* carried by the picketers disclosed that the employees' dispute was with their primary employer, Preferred. However, according to the Board, that message was obfuscated by language in the *leaflets* distributed to passersby during the picketing on October 29. In particular, the Board focused on one sentence in the leaflets that read: "We are calling on KGO radio to take corporate responsibility in ensuring that *their* janitors receive higher wages, dignity on the job," etc. (Emphasis added.) The Board reasoned that by using the word "their" in this sentence, the picketers "led the public to believe that KGO—who was not involved in the dispute—was their employer and had the ability to adjust their working conditions."

We do not think the Board's reasoning can withstand scrutiny, even granting the Board the deference it is due. The one sentence on which the Board focused cannot be viewed

in isolation; it must be considered in light of the evidence as a whole. *See United Association of Journeymen v. NLRB*, 912 F.2d 1108, 1110 (9th Cir. 1990). The most important evidence relating to the identity of the party with whom the employees had a dispute was the message displayed prominently on the signs the picketers were carrying: "PREFERRED BUILDING SERVICES UNFAIR!" The signs never mentioned KGO Radio or any other neutral third party and thus left no doubt that the employees' dispute was with Preferred alone. Consequently, this case is unlike the typical case in which the Board finds the fourth *Moore Dry Dock* criterion to be unmet: one in which the union fails to identify the primary employer at all. *See, e.g.*, *Service Employees International Union Local 87 (Pacific Telephone)*, 279 N.L.R.B. 168, 175 (1986); *Local 32B-32J, Service Employees International Union*, 250 N.L.R.B. 240, 244–45, 247–48 (1980).

Contrary to the Board's conclusion, the reference to KGO Radio in the leaflets did not dilute the clarity of the message disclosed by the signs. At the outset, the leaflets themselves clearly described the relationship between the employees, Preferred, and KGO Radio: "We work for *Preferred Building Services* which cleans the offices of KGO radio." (Emphasis added.) The relationship described is one familiar to members of the general public, in which janitorial workers are employed by a janitorial services company hired to clean the offices of a multi-tenant building. In light of the upfront disclosure that the employees worked for Preferred and cleaned the offices of KGO Radio, readers of the leaflets would have understood the subsequent statement calling on KGO Radio to accept corporate responsibility for "their" janitors to refer to the company in its capacity as a tenant of the building benefitting from the employees' labor, not as their employer. That understanding

is even more inescapable with respect to the leaflets distributed on November 19, which replaced the sentence the Board found problematic with a sentence reiterating that Preferred was the entity with whom the employees had a dispute: "We are calling on KGO radio and Cumulus Media as the major tenant[s] to help in getting *Preferred Building Services* to listen to our demands and not ignore us." (Emphasis added.) The Board itself has previously held that referring to neutral parties in picketing materials is permissible as long as it remains clear that the dispute is with the primary employer. *In re Pacific Northwest District Council of Carpenters*, 339 N.L.R.B. 1027, 1029 (2003).

The combination of the picket signs and the leaflets, considered in their entirety, clearly disclosed that the employees' dispute was with Preferred and not with any of the building's tenants. The Board therefore erred in finding that the fourth *Moore Dry Dock* criterion was not met and in failing to afford a presumption of lawfulness to the employees' picketing.

C

The presumption of lawfulness afforded by the *Moore Dry Dock* criteria is a rebuttable one, and the Board held that even if the presumption applied, it was rebutted by independent evidence that the employees' picketing had a prohibited secondary object—namely, to pressure Harvest Properties to "cease doing business" with Preferred. 29 U.S.C. § 158(b)(4)(ii)(B).[1]   In our view, the Board's

---

[1] In concluding that there was independent evidence of a secondary object, the Board exclusively relied on evidence pertaining to Harvest. The Board cited no independent evidence suggesting that the employees had a "cease doing business" object as to KGO Radio or any other tenant of 55 Hawthorne Street.

conclusion is not supported by substantial evidence. The record shows that, throughout "the entire course of conduct" at issue here, the target of the employees' picketing was always Preferred, not Harvest. *Local 560, International Brotherhood of Teamsters (County Concrete Corp.)*, 360 N.L.R.B. 1067, 1068 (2014).

In *Operating Engineers*, the Supreme Court fleshed out what it means for a union to act with a prohibited secondary object. 400 U.S. at 303–05. In that case, the operating engineers' union had a dispute with the primary employer, White Construction, one of three subcontractors hired by neutral party Burns & Roe, the general contractor. The union informed Burns & Roe that its members intended to strike unless Burns & Roe signed a contract, which would have been binding on all three subcontractors, acceding to the union's demands. When Burns & Roe refused, the operating engineers employed by all three subcontractors walked off the job and threatened Burns & Roe and the subcontractors with further work stoppages. *Id.* at 300–01.

There was no dispute that the union had engaged in coercive conduct. *See* Brief for Respondent at 5–6, *NLRB v. Operating Engineers*, 400 U.S. 297 (1971) (Nos. 40, 42), 1970 WL 121901, at *5–6. The only issue was whether the union had acted with an impermissible secondary object. As noted earlier, the Court held that the "cease doing business" element of the statute could be met by showing that the union sought to force the neutral employer either to terminate its contract with the primary employer or to pressure the primary employer into changing its labor policies. 400 U.S. at 305.

Before reaching the question of what qualifies as a "cease doing business" objective, however, the Court first analyzed whether the union had even engaged in secondary,

as opposed to primary, activity. *Id.* at 303.  Distinguishing between the two types of conduct requires an inquiry into the union's intent.   If a union engages in coercive conduct directed at the primary employer merely hoping that neutral parties will be induced to take action supportive of the union's cause, its conduct remains primary in character and is not forbidden by § 8(b)(4)(ii)(B). *See Electrical Workers*, 366 U.S. at 673.   The union's conduct loses its primary character only when an *object* of that conduct is coercing one or more neutral parties into taking action supportive of the union's cause.   Determining whether the union acted with the requisite intent often requires "the drawing of lines more nice than obvious," but it is a task the statute nonetheless compels.  *Id.* at 674.

In *Operating Engineers*, "the normally difficult task of classifying union conduct" as primary versus secondary was "easy."  400 U.S. at 303.  The union's coercive activity was "aimed directly" at neutral parties—namely, Burns & Roe and the two subcontractors not involved in the primary dispute.  *Id.* at 303–04.  The union engaged in a strike against these neutral parties "for the specific, overt purpose of forcing them to put pressure on White," the primary employer.  *Id.* at 304.  Thus, the union exerted coercive pressure that was "unmistakably and flagrantly secondary." *Id.*

In our case, while the Union may have engaged in coercive activity (picketing and patrolling), the Board's finding that it constituted secondary, as opposed to primary, activity is not supported by substantial evidence.  Because the Union's picketing complied with the *Moore Dry Dock* criteria, a rebuttable presumption arose that it was primary in character.   In concluding that there was independent evidence of a secondary object sufficient to rebut that

presumption, the Board relied most heavily on statements made during and after the November 19 meeting that occurred while picketing was underway. As noted earlier, several of the employees, the Union's president, and a co-director of the San Francisco Living Wage Coalition met with Maxon of Harvest Properties. Maxon recalled that the Union's president told him at the meeting that the picketers would "keep showing up until we made changes" to the employees' wages, which the Board interpreted as "until [*Maxon*] made changes" to the wages. (Emphasis added.)

We do not think this statement can bear the weight the Board placed upon it. By stating that the employees would "keep showing up," the Union indicated that the employees would continue to engage in the same type of picketing they had engaged in earlier. But that picketing was directed solely at Preferred, not Harvest. At no point was Harvest ever mentioned in any of the picketers' signs, leaflets, or chants, and nothing else that transpired during the picketing suggested that, despite their focus on Preferred, the picketers also sought to place coercive pressure on Harvest. The statement made during the meeting on November 19 did not reveal a new, previously hidden object of the picketing already underway, nor threaten future picketing that would be secondary in character. Even deferring, as we must, to the Board's reading of the statement, Maxon's inference that the picketing would stop if he helped to increase wages does not reveal a secondary object or even the Union's precise statement. Maxon's recollection is consistent, for example, with the Union's having stated that it would continue to picket until wages were increased generally, without specifying who should make that change. Indeed, Maxon could not recall whether the Union had asked him to "talk to Preferred or talk to somebody about raising wages," even though that would have been the most obvious request for

the Union to make if it were, in fact, trying to coerce Harvest into pressuring Preferred.

The Board's decision in *County Concrete* illustrates the distinction between picketing with an impermissible secondary object of coercing a neutral employer and picketing that remains directed solely at the primary employer. In that case, the Board addressed two different conversations between union representatives and neutral employers, one that it found to reflect an unlawful secondary object, the other that it found to be lawful. In the first conversation, the union's president told the neutral employer that if he did not switch to a supplier paying higher wages, the union would be "putting a picket line against *you*"—*i.e.*, the neutral employer—and told him to reconsider "[b]efore *you* run into a problem." 360 N.L.R.B. at 1069 (emphasis added). Based on those statements, the Board found that "the threatened picketing was specifically aimed at [the] neutral employer." *Id.* at 1070.

In the second conversation, the union agent told the neutral employer that the primary employer would have to pay the area standard wages "or else he would picket *the job*." *Id.* at 1071 (emphasis in original). The union agent then told the neutral employer that if he did not want the union to picket the primary employer at the jobsite, he "would have to get somebody else because [the primary employer] is not paying the wages." *Id.* at 1072. The Board deemed this second conversation to be "a textbook illustration of a lawful, primary objective," emphasizing that the union never threatened to establish a picket line against the neutral employer. *Id.* at 1071.

The Union's statement to Maxon that the employees would "keep showing up" unless Maxon made changes to their wages is akin to the second conversation in *County*

*Concrete*. The Union was simply explaining "the realistic options that [Maxon] had available if [he] did not want the Union to picket [Preferred] at the jobsite." *Id.* at 1072. It would be a different matter if the Union had told Maxon, "If you don't make changes to our wages, we will keep showing up to picket *you*." In that case, the Union's statement would be akin to the first conversation in *County Concrete*, evincing an unlawful intent to coerce a neutral employer. The actual conversation that took place, though, contained no indication of such an intent.

To support its finding of an impermissible secondary object, the Board also relied on the Union president's statement to Maxon that it seemed "inappropriate" that Rafael Ortiz was still working at 55 Hawthorne given the allegations against him. But the Union's president made this statement while explaining why the employees were picketing. The Board has previously held that simply informing a neutral employer about the nature of a labor dispute does not establish an unlawful secondary object. *See Carpenters District Council of Detroit & Southeastern Michigan*, 322 N.L.R.B. 612, 612 (1996). Moreover, Maxon stated that the Union never asked him to ban Rafael Ortiz from the building, much less demand that he take such action on threat of picketing directed against Harvest. Instead, as Maxon testified, he made the decision to ban Rafael Ortiz from the building of his own volition.

The remaining evidence on which the Board relies does even less to rebut the presumption of lawfulness. The Board noted that, during the November 19 meeting, the employees were "happy" when Maxon told them that Harvest planned to look for a unionized contractor to replace Preferred. That the employees were pleased by this news does not show that Harvest's decision came about as a result of unlawful

secondary picketing.  To the contrary, Maxon testified that Harvest had already been planning to transition to a union contractor either before or around the time of the picketing, and the ALJ found no evidence to connect that decision to the picketing.  "The objectives of any picketing include a desire to influence others" to take actions favorable to the employees' cause.  *Electrical Workers*, 366 U.S. at 673. That others are moved to do so, and that the employees are "happy" about that outcome, does not transform a lawful primary picket into an unlawful secondary one.  *See Ramey Construction Co. v. Local Union No. 544*, 472 F.2d 1127, 1131 (5th Cir. 1973).

The Board further noted that, after the meeting with Maxon, one of the employees announced to the other picketers, "it seems to me that the negotiations . . . were successful and we gained a victory," referring to the fact that Rafael Ortiz had been banned from the building.  Another employee stated, "we spoke with the building manager and he suspended our employer and promised there will be changes and respect for us."  But a union is free to speak with, and even to negotiate with, a neutral employer as long as those discussions do not take place in the shadow of coercive conduct directed against the neutral employer.  *See Carpenters v. NLRB*, 357 U.S. 93, 99 (1958).

Finally, the Board relied on the employees' reports that the building's tenants were "upset" about the picketing as evidence that the employees had an impermissible secondary object, citing *Service Employees International Union Local 525 (General Maintenance Co.)*, 329 N.L.R.B. 638 (1999). In that case, the janitorial union had engaged in "trashing episodes," which involved storming building lobbies and strewing trash around, in order to pressure tenants to demand that the building owners force the janitorial contractors to

resolve the dispute. *Id.* at 664–65. In finding that the union had an impermissible secondary object, the Board relied on a union agent's statements in a radio broadcast that neutral tenants were "upset" by the trashing episodes. *Id.* at 680. The reaction of the tenants was relevant evidence there because the union directly targeted the buildings' tenants and owners with its coercive activity. In this case, by contrast, the Union never engaged in coercive conduct targeting Harvest or any of the building's tenants. Additionally, while in *General Maintenance* the tenants were upset about the union's trashing of their buildings, here the tenants were "upset by what they had learned" from the demonstrations—presumably, that Preferred was not treating its employees well. The evidence about the emotional reaction of the tenants in this case merely suggests that the Union was successful in gaining the sympathies of others through its primary picketing.

\*          \*          \*

In short, the Board failed to identify substantial independent evidence rebutting the presumption that the employees' picketing was lawful. The Union never made any statements or took any actions indicating that an objective of its picketing was to coerce Harvest into pressuring Preferred to meet the employees' demands. Certainly, the picketing led to disruption of the business relationship between Harvest and Preferred. Ultimately, Preferred cancelled its contract with Harvest, and Harvest then hired a unionized contractor. But, as the Supreme Court has noted, "[s]ome disruption of business relationships is the necessary consequence of the purest form of primary activity." *Operating Engineers*, 400 U.S. at 304.

The Board erred in concluding on this record that the employees' picketing violated § 8(b)(4)(ii)(B) of the NLRA.

We remand to the Board for further proceedings consistent with this opinion.

**PETITION FOR REVIEW GRANTED; CASE REMANDED.**